## TORONTO, HAMILTON & BUFFALO NAVIGATION CO. v. UNITED STATES.

No. 46435.

United States Court of Claims.

March 6, 1950.

Madden and Whitaker, JJ., dissented.

Frank J. Mahony, New York City, for the plaintiff. Frederick L. Wheeler and C. Austin White, New York City, were on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Acting Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

On December 6, 1948, this court entered a judgment in favor of plaintiff in the amount of $161,833.72. 112 Ct.Cl. 240, 81 F.Supp. 237. By virtue of a writ of certiorari brought in the Supreme Court of the United States, that Court reversed our judgment and remanded the cause to this court for "further proceedings in the light of this opinion [of this court.]" 70 S.Ct. 217, 223.

■ In determining what sum would represent just compensation to the owner of requisitioned property at the time and place of taking we are first met with the general proposition that market value at the time and place of taking is just compensation for condemned property. United States v. New River Collieries, 262 U.S. 341, 344, 43 S.Ct. 565, 67 L.Ed. 1014; United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; United States v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390.

■ However, to establish a "market value," the transactions relied upon must be of sufficient number and the quantities sold extensive enough to establish a proper criterion of market price. United States v. New River Collieries, supra, 262 U.S. at page 345, 43 S.Ct. at page 567.

The sales of car ferries on the Great Lakes at or about the time of the taking of the Maitland No. 1 did not represent a sufficient number of similar vessels to form a proper basis for the establishment of a "market value" according to established legal concepts.

■ The Supreme Court has told us that a resort to substitute standards such as reproduction costs less depreciation or capitalization of earnings could not be justified under the circumstances. In view of the economic status of the car ferry industry on the Great Lakes at the time of the requisition, it is not probable that anyone would have reproduced a car ferry of the size and type of the Maitland No. 1. Because of the fact that the ship had been tied up at the dock for several years, a consideration of its earnings during the years it had been in operation was not justified.

The most nearly contemporaneous transactions in car ferries of vessels of almost identical age, specifications, carrying capacity, etc., were in connection with three ocean-going ferries, the Henry M. Flagler, Joseph R. Parrott and the Estrada Palma, which were purchased off the east coast of Florida and towed to New York before

being placed in service (Tr. pp. 468–589). We will discuss those transactions briefly later on in this opinion.

The Supreme Court has indicated to us that the absence of "market price" does not, *ipso facto*, rid isolated contemporaneous sales of all relevance and that in all likelihood "the differences between the Maitland [No. 1] and ships sold on the Great Lakes between 1936 and 1942 may be calculated with some * * * accuracy"; further, that the circumstances might indicate the relevancy of the Maitland No. 1's insurance valuation.[1]

We consider first the matter of insurance. From January 1, 1938, to August 20, 1942, plaintiff maintained insurance on the Maitland No. 1 based on a valuation of $100,000. Most of the cases in which insurance has been considered in the determination of the value of the ship involved deal with vessels in actual operation. However, we can conceive of no good reason why the same considerations should not be made in the determination of the value of a ship tied up at dock. In either case, the owners of the vessels would be guided by the same motives and business considerations in fixing the amount of insurance which they felt would serve that double purpose for which all insurance is intended—i. e., protection against total loss and the desire to be made "whole" as near as possible in the event of total loss.

■ Our inquires into this subject lead us to the conclusion that while "appraisals for insurance" may be a factor in the determination of value for just compensation, they are always a bit unreliable and sometimes irrelevant. The Petar, D.C., 68 F. Supp. 296, 300. The theory and practice of insurers and insured is to make the limit of insurance much less than the value of

the property, while owners are permitted to procure insurance in amounts below this limit. The result is that the amount of insurance has no fixed or uniform relation to the value of the property it covers, and hence does not directly tend to disclose its value. Union Pacific R. Co. v. Lucas, 8 Cir., 136 F. 374; Adelphia Hotel Co. v. Providence Stock Co., 3 Cir., 277 F. 905; Roscoe, Damages in Marine Collision, 35.

■ Since the Maitland No. 1 was valued for insurance purposes at $100,000, and since there is nothing in the record to indicate anything fictional or fraudulent concerning this amount, we feel justified in proceeding upon the theory that a fair value to represent just compensation could not be any less than that amount.

We have found that the highest and most profitable use for which the Maitland No. 1 was adaptable in 1942, at the time of its requisition, was as a highway ferry for transporting automobiles and passengers on the Great Lakes or similar bodies of fresh water involving no greater length of haul. Further, that its conversion could have been accomplished more economically and more quickly for that purpose than for any other (Finding 18).

■ In Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236, it was stated that the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as a measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held."

Accordingly, we turn now to a consideration of the transactions in car ferries on the Great Lakes between 1936 and 1942.

---

1. Rule 3, Advisory Board on Just Compensation, 1943 A.M.C. 1443, 1444, states that:

"Where market value cannot be determined by sufficient sales or hirings of vessels of like character, made at or about the time of taking, it is to be determined by the Administrator from a consideration of cost of construction, acquisition cost so far as relevant, improvements, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment for value can be based. These various matters are to be given such weight by the Administrator as in his opinion they are justly entitled to, in determining the price that would probably result from fair negotiations between an owner willing to sell and a purchaser desiring to buy."

Between 1936 and 1940, several car ferries similar to the Maitland No. 1 were sold to purchasers who converted them to highway ferries. In 1938, the Pere Marquette Railway Company sold the car ferry, Pere Marquette No. 20, which had been built in 1903 from the same plans as the Maitland No. 1, to the Michigan Highway Department. The sale price was $50,000, plus an additional $10,000 for delivering the vessel across Lake Michigan to a shipyard. This boat had been laid up in September, 1930 and nothing had been expended on her for maintenance or repairs between that time and the date of sale. In 1936 the owners made a survey of the vessel and estimated that it would cost $173,700 to place her in operating condition for use as a car ferry for a period of 5 years.

In 1940, the Pere Marquette Railway Company sold the car ferry, Pere Marquette No. 17, which had been built in 1901 to the same plans as the Maitland No. 1, to the Michigan Highway Department for $65,000. This vessel had likewise been laid up for a number of years prior to her sale and in 1936 the owners had estimated that an expenditure of $147,200 would have been required to place the vessel in operating condition as a car ferry for a period of five years.

In 1936 the Ann Arbor Railroad sold the car ferry, Ann Arbor No. 4, to the Michigan Highway Department for $25,000. The vessel was much smaller than the Maitland No. 1, being only 250 feet in length as compared with the 350 feet in length of the Maitland No. 1. There is no proof with respect to the age and condition at the time the vessel was sold in 1936.

In addition to the above vessels, which were sold and converted to highway ferries, we have found that in 1940 and 1942, two car ferries, which were in a very bad state of repair, were sold to purchasers who removed the engines from the boilers, tore off the superstructure of the vessels, and used them as bulk carriers of pulpwood.

In July 1940, the Pere Marquette Railway Company sold the Pere Marquette No. 19 for $24,000. The vessel was built to the same plans as the Maitland No. 1 and was the sister ship to the Pere Marquette No. 20 mentioned above. She had been laid up a number of years and just prior to the sale, the owners estimated that an expenditure of $308,000 would be required to recondition her for an additional 15 or 20 years' operations.

In 1942 the Marquette and Bessemer No. 2 was sold for $37,724.04. The vessel was built in 1910 from the same plans as the Maitland No. 1 and had formerly been used as a car ferry on Lake Erie. She had been retired in 1941 and had received no maintenance or repairs thereafter. Prior to the sale the owners had estimated that by spending $300,000 for repairs the vessel could be placed in condition to operate for 15 to 20 additional years.

It is interesting to note that in connection with each of these vessels an estimate was made at or near the time of sale of the amount of money it would require to place them in operating condition, as follows:

| Year of sale | Name of vessel | Amount sold for | Amount required to place in operating condition |
|---|---|---|---|
| 1938 | Pere Marquette No. 20 | $50,000.00 | $173,700 |
| 1940 | Pere Marquette No. 17 | 65,000.00 | 147,200 |
| 1940 | Pere Marquette No. 19 | 24,000.00 | 308,000 |
| 1942 | Marquette and Bessemer No. 2 | 37,724.04 | 300,000 |
| 1942 | Maitland No. 1 | ......... | [1] 34,980 |

The sales of the Pere Marquette No. 20 and Pere Marquette No. 17 made in 1938 and 1940, respectively, to the Michigan Highway Department seem to furnish the closest analogies to the Maitland No. 1 with respect to type of vessel, age, and the time of sale. However, they do differ in one material respect, in that nothing had been expended upon them for maintenance and repairs between the time that they were laid up and the date of sale, whereas the Maitland No. 1 during the eight-year period

1. Finding 14.

it had been laid up at Ashtabula, Ohio, before she was requisitioned was continuously kept in condition by a captain and a chief engineer. The boilers were fired up every winter and the engines were turned over periodically. The main and auxiliary engines were kept lubricated, the bright work was greased and minor repairs, of the kind needed to keep the vessel from deteriorating, were made from time to time. On August 21, 1942, the day after the Maitland No. 1 was requisitioned, a representative of the defendant made a condition survey of the vessel and itemized the repairs that were necessary to place her in operating condition which, as set out in our Finding 14, aggregated a total of $34,980.

It occurs to us that the estimated amounts required to place the vessels in operating condition might furnish some basis for determining a fair value for the Maitland No. 1. At the time the State of Michigan paid $50,000 for the Pere Marquette No. 20, it was estimated that it would require $173,700 to put the vessel in operating condition. The cost of putting the Maitland No. 1 in operating condition at the time she was taken was $34,980. The difference between these two figures is $138,720. If it is assumed that the Maitland No. 1 was worth $138,720 more than was paid for the No. 20, the fair value of the Maitland No. 1 would be $188,720.

The State of Michigan paid $65,000 for the Pere Marquette No. 17 and at that time the repair estimate was $147,200. The difference between the repair cost of the Maitland No. 1 and that for the No. 17 amounts to $112,220. Assuming that the Maitland was worth $112,220 more than was paid for the No. 17, the fair market value of the Maitland No. 1 would be $177,220.

It will be noted that while the No. 17 was purchased at a later date (1940) than the No. 20 (1938), the State of Michigan paid $15,000 more for the No. 17 on this later date. There is more than passing significance in this difference of price which the State of Michigan was willing to pay for car ferries for conversion purposes in 1938 and 1940. The year 1940 was previous to the entry of our country into World War II and consequently prior to the tremendous impact upon our whole economy which occurred after 1941. We cannot assume that the State just accidentally paid more for the No. 17 in 1940 than it did for the No. 20 in 1938. It indicates to us that car ferries suitable for conversion into highway ferries were becoming more valuable and "owners willing to sell" and "purchasers desiring to buy" were determining higher prices as a result of fair negotiations. From pure economic reasons, the Maitland No. 1 was a much better boat in every respect than were the Nos. 17 and 20, especially in view of its age (it had been built approximately 14 years later than the others) and its state of repair.

There are also before us the transactions with reference to the Pere Marquette No. 19 which occurred in 1940 and the Marquette & Bessemer No. 2 which occurred in 1942, but the evidence clearly establishes that at the time of these sales both vessels were in such poor condition that the expense of repairing and converting them to highway ferries would probably not have been justified. The amounts for which they sold represent, in our opinion, only their scrap value.

Thus in our quest for a fair value of the Maitland No. 1 at the time and place of its taking, we are placed in somewhat of a dilemma. In April, 1943 the War Shipping Administration thought the vessel was worth $72,500, which is the amount it fixed as just compensation for and the fair value of the Maitland No. 1. On the other hand, the plaintiff contends that this value is somewhere between a minimum of $332,500 and a maximum of $458,689.89.

Since we did not include in our former opinion any summary of certain testimony with reference to the valuation of the Maitland No. 1, we feel that this should now be done. There were three witnesses on behalf of the plaintiff. Dwight True, a naval architect for forty-three years with the Great Lakes Engineering Works, testified that the reproduction cost of the vessel in August 1942 was $1,596,100. This figure was based upon the original cost of $362,380 plus a percentage applied for increase in costs and other amounts for additions to the vessel. However, this witness did not

undertake to state the value of the vessel on August 20, 1942, the date of its requisition.

Another witness for the plaintiff, Andrew Birch, superintendent of construction and repair of all floating equipment of the New York Central Railroad, a man with over 40 years' experience in the field of shipbuilding, testified that the value of the vessel on August 20, 1942, was $731,148. This was based upon Dwight True's reproduction cost less depreciation at 2 percent a year for 26 years, less the $34,980 required to put the vessel in repair. This value, however, was for use as a car ferry and not for a converted purpose.

The third witness for plaintiff, William M. Finkenaur, a ship surveyor and consulting engineer, fixed the value of the vessel on August 20, 1942, as $869,495. This was based upon an estimated reproduction cost of $1,530,448, depreciated at the rate of 2 percent a year for 26 years progressively.

Two witnesses were presented on behalf of the defendant. The first, James Gilmore, a naval architect employed by the firm of German and Milne of Montreal, Canada, who was especially familiar with all types of vessels operating on the Great Lakes, testified that the value of the vessel on August 20, 1942, was $145,000. This figure was based upon an estimated reproduction cost of $1,310,000 depreciated on a diminishing balance for an estimated 40-year life at the rate of about 6 percent.

The other witness for the defendant was Wade H. Rutland, who fixed the value of the vessel on August 20, 1942, at $152,400. In view of the importance of this witness on behalf of the Government and his testimony, we feel that some further comment is necessary. Rutland's testimony is to be found in Transcript pages 468 through 589, covering a total of 121 pages. Rutland stated that he had about 35 years' experience in buying, selling, surveying and appraising vessels and at one time had been general manager of a marine construction company. He had engaged in business in New York under the firm name of Rutland Maritime Exchange, Inc.; in London, England, under the name of Turner, Rutland and Company, Limited, and a further company known as Surveyors' Company, Inc., of Washington, D. C. During the war he was engaged as an appraiser by the War Shipping Administration, and during the year 1943 was sent to the Great Lakes where he supervised the transportation of boats from the Great Lakes to the Gulf of Mexico. He was particularly familiar with the Maitland No. 1 as he had seen her under construction in 1915, and at one time had had the vessel for sale. An examination of his testimony will disclose that he was fully informed regarding the entire American market for used vessels not only on the Great Lakes and the Gulf of Mexico but the Atlantic and Pacific sea coasts as well. With all his knowledge and general information on the subject, he saw fit in his testimony to fix the value of the Maitland No. 1 by a consideration of the sales of the Henry M. Flagler, the Joseph R. Parrott and the Estrada Palma, which in his opinion constituted comparable car ferries (Tr. 545). The Henry M. Flagler was an ocean-going vessel requisitioned by the War Shipping Administration on July 28, 1941, in Florida, and towed to New York City. This vessel was practically identical with the Maitland No. 1 in specifications, in age, and had been laid up for approximately the same period of time as the Maitland No. 1. He testified that the value of the Maitland No. 1's machinery alone was $135,000, with a net depreciated value of over $70,000. He estimated that the depreciated value of the boilers was $38,500 and noted that the hull had sold for $35,000. Considering all these factors based upon his long years of experience, he concluded that at the time of its taking the Maitland No. 1 had a value of $152,400. It is to be noted that this figure includes "enhancement" of $11,420 as a result of the war and the Government's demand for vessels between 1941 and 1942. Excluding from consideration this amount under the principles laid down in the case of Cors v. United States, 75 F.Supp. 235, 110 Ct.Cl. 66; Id., 337 U.S. 325, 69 S.Ct. 1086, a net value of $140,980 results.

A summary of the testimony of the expert witnesses fixing the value of the Mait-

land No. 1 at the place and time of its taking is as follows:

Finkenaur for plaintiff........................ $869,495
Birch for plaintiff ............................. 731,148
Rutland for defendant ......................... 140,980
Gilmore for defendant ......................... 145,000

There is, therefore, not only a conflict of opinion between the parties to the suit but a conflict in the testimony of the witnesses who testified in this case. The general rule with reference to such conflicts of testimony is stated in 22 Corpus Juris at page 738, as follows: "In case of a conflict between skilled or expert testimony and other evidence in the case, the jury, or the court trying a question of fact, is not bound to accept the skilled or expert testimony in preference to the other, but may judge of the weight of each and determine the issue of fact as it deems proper, and the same rule applies *a fortiori* where there is a conflict between the opinions of different experts or skilled witnesses, it being then for the triers of fact to decide which witnesses they will believe or rely on, or even to adopt a conclusion between those reached by the different witnesses." See also 32 C.J.S., Evidence, § 572. See also Puget Sound Power and Light Company v. Puyallup, 9 Cir., 51 F.2d 688 and Mason City & Ft. Dodge R. Company v. Boynton, 8 Cir., 158 F. 599.

In a condemnation case, there were seven witnesses but none of them agreed as to the damages to the land, the estimates ranging from $5,000 to $175,000. The jury viewed the premises and awarded $9,000. It was held that the finding was binding on both parties in the absence of a showing that the jury was influenced by passion or prejudice. United States v. Seufert Bros. Co., C.C., 87 F. 35.

In United States v. 25,406 Acres of Land, etc. in Arlington County, Virginia et al., 4 Cir., 172 F.2d 990, the lowest value placed upon the property by witnesses for the owners was $2.50 per square foot. Others placed it at $2.50 to $3.00, $2.75, $3.00, $3.10 to $3.60 and one as high as from $5.00 to $6.00. Testimony of the Government was that the property was worth from 70 cents to 75 cents per square foot. The

jury's verdict fixed it at $1.45 per square foot which was approximately double the value fixed by the Government witnesses and half that of the median witnesses for defendants. The appellate court found no error and the judgment was affirmed. Montana Railroad Company v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681; United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859.

The able and experienced trial commissioner of this court, who saw the various witnesses face to face, and had the opportunity to observe them on the stand as they gave their testimony, found the value of the Maitland No. 1 to be $182,900. We think this valuation is too high. As we evaluate the evidence before us, under the principles laid down by the Supreme Court in the Cors case, supra, and its directions to us in the instant case, we find the amount of money which would represent just compensation to the plaintiff for the Maitland No. 1 at the time and place of its taking to be $142,500.

Against this amount the defendant is entitled to credit for the sum of $54,375 paid on June 10, 1944.

Plaintiff is also entitled to recover compensation measured by interest at 4 percent per annum for delay in payment on $142,500 from August 20, 1942, to June 10, 1944, and on $88,125 from June 10, 1944, to date of payment.

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER and MADDEN, Judges (dissenting).

We are still of the opinion that the Government's determination and offer of $72,500 for the Maitland No. 1 was adequate. The court has arrived at its higher valuation by the consideration of various factors, all of them proper elements for consideration in a just compensation case. The additional factor that we would consider is the unlikelihood that any purchaser at all would have happened to want to purchase this obsolete vessel at any reasonable price. It is a not infrequent occurrence that a ma-

chine, obsolete for the purpose for which it was built, may have, theoretically, a rather large intrinsic value for adaptation to some other purpose. But there is usually no real market for the machine at such a value unless the demand is considerable and the supply is scarce. Neither of these facts has been shown as to the ship here in question. Because, then, of the fact that the ship was useless to the owner, and the demand for its type was not large, any purchaser would have expected a heavy discount from any theoretical valuation which it might have had in a ready market.