CoweN, Chief Judge,
dissenting:
The first ground for the Court’s order of remand is that the Commission’s reasoning is lacking in the detail and specificity needed to enable the Court to determine whether the Commission’s conclusions on valuation are supported by substantial evidence and untainted by legal error. With deference, I do not join in the Court’s order, because I think the remand is unnecessary in this case. I also think that the order imposes requirements on the Commission that are beyond the purview of the applicable statute and contrary to the rules of law generally followed in this court and other courts for the review of a factfinder’s determination of the value of property. I do not read 25 U.S.C. 70r(3) as requiring the Commission to pinpoint its value determinations by setting out in detail the arithmetical computation or formula used in a case where the evidence is conflicting and the value found is well within the range of values testified to by the witnesses. All that the statute requires is that the Commission provide a statement of the reasons for its findings and conclusions. I think it has done so in this case.
In the beginning of its opinion, the Commission pointed out that on the basis of the evidence offered by petitioners, they claimed that the value of the lands, exclusive of the lead lands in Dubuque, Iowa, was from $2.50 to $3 or more per acre in the 1833-39 period. In contrast, the value figures claimed by defendant, on the basis of its evidence, were in *551 the range of 43 cents to 80 cents per acre for the same lands [Appendix 4] ,[1]
The Commission then proceeded to set forth the reasons on which its determinations of value were based. Among these were the lack of a land market of any kind in eastern Iowa in 1833, whereas across the Mississippi River and in Illinois and in Missouri, there was a large quantity of public land available at $1.25 per acre [Appendix 4-5]; various physical and economic factors, including the excellent soils and topography of the lands, the favorable climate and growing season, the presence of good stands of timber along the water courses, and the rapid growth of population during the 1833-39 period [Appendix 7].
The Commission also referred to the establishment of territorial and local governments in Iowa, and the passage of the 1838 Preemption Act; the volume and rate of nearby public land sales from 1820 to 1850, and private sales that occurred in the ceded areas from 1838 through 1856 [Appendix 8].
The Commission also took into account prevailing business conditions, farm prices and farm costs, current interest rates, the lack of a sound currency and the scarcity of money [Appendix 8]. The Commission also called attention to the very large size of the ceded areas and the requirement that each tract be valued as a whole [Appendix 9].
In each instance, the Commission’s statement of the reasons for its conclusions is backed up by carefully prepared and detailed findings of fact. Finally, the Commission stated that, in the absence of comparable sales in an actual market, it utilized the data offered by defendant’s expert witness, Dr. William G. Murray, as it had done with similar data in other cases. However, his testimony was considered on an equal footing with other value criteria, and the Commission determined that his ultimate conclusions as to value were too *552 low [Appendix 6].[2] I will not discuss the other criteria considered by the Commission, because I think that its opinion and findings adequately set forth the reasons for its conclusion. The situation here is unlike that before the Court in the Nez Perce case, where the Court found that the Commission increased the value of Indian land from $4 to $5.50 per acre without making any findings to support the new figure.
A determination of the fair market value of Indian land is a difficult task and often requires a determination of values as of a date which precedes the date of the trial by more than one hundred years. Vast acreages of land, far exceeding the acreage included in any private sales, are involved, and usually there is no evidence of truly comparable sales. In such situations, the trier of the facts must rely primarily upon the testimony of expert witnesses. Where, as in most cases, the testimony of the expert witnesses is conflicting, the trier of the facts is the judge of the weight to be given their testimony. It is his function to decide which witnesses are to be relied on and, in determining the value of property, he may find an amount that lies between the figures advanced by different witnesses. This is a rule which is followed in the Court of Claims and I believe in most courts. Toronto, Hamilton & Buffalo Nav. Co. v. United States, 116 Ct. Cl. 184, 88 F. Supp. 1016 (1950). The trial commissioners of the Court of Claims often determine the value of Indian land and other property in cases where the testimony of expert witnesses is in conflict. Frequently, the commissioners find a value which is somewhere between the figures advanced by the opposing experts. When this occurs, I have never known of a case where the court required them to set forth the mathematical computations or other detailed methods by which they made their determinations. We should not impose a more exacting standard on the Indian Claims Commission.
The second basis for the court’s remand, as stated in the order, is the court’s inability to determine whether there is a *553 significant and unwarranted inconsistency between the valuations (or the theory underlying them) adopted in this case and that adopted later in Docket No. 153. The alleged inconsistency is based upon the appellant’s contention that in Docket No. 153, the Commission relied on evidence offered by them of private resales of land in eastern Iowa, whereas 'in this case, the Commission rejected the same evidence.
There was a time spread of many years between the valuation dates of the lands involved in this appeal and the relevant valuation dates of the lands in Docket 153. More importantly, in the latter period there was a rapid growth of population in Iowa, a greater knowledge of the fertility and worth of the land, and other causes for the increase in land values as detailed in the Commission’s findings of fact [Appendix TT — 86]. In my opinion, the findings of fact and opinions of the Commission in both cases show that there was a rational and valid basis for the differences in probative value which the Commission gave to the evidence of resales of private land in eastern Iowa.
In both cases, the Commission admitted and considered evidence of private resales of land lying within the ceded areas. The Commission attached little weight to these resales, because of the dates on which the sales were made and other factors affecting the land values at that time. Thus, in the case now before us, the Commission’s opinion states as follows:
The private sales data in the record was limited exclusively to those transactions that occurred in the ceded areas beginning from about 1838 through 1856. * * * [Emphasis supplied]
Except for the relatively few number of sales that occurred prior to and at the time of the 1838 effective date of the Iowa cession, the [448] bulk of the private sales in eastern Iowa do not qualify as comparable sales, but they do earn some probative value as hindsight or confirmatory evidence. * * * [Appendix 8]
The petitioners in Docket 153 also presented evidence of the resale prices of the ceded lands involved in that case, as shown in Commission finding 27 [Appendix 82]. Just as in the case *554 before us, the Commission gave little weight to the evidence of the resale prices of the ceded lands in Docket 153. In that connection, the Commission said:
Kesults of these resales in Cession 262 would not have been known to a purchaser as of the valuation date of either portion of the tract, and thus can be regarded only as hindsight information which can be used only to corroborate findings of value based on [405] information known as of the valuation date. [Appendix 82]
In its opinion in Docket 153, the Commission gave the following explanation of its reasons for giving greater weight to the evidence of the private resales of the lands in eastern Iowa than was accorded to such evidence in this case:
Kesales of land in the cession area, we feel, do not carry great weight since they would not have been known to a purchaser on the valuation dates and because they reflect a land market with far different patterns of settlement than existed on the earlier valuation dates. The resales in eastern Iowa from 1838 to 1843 are, we feel, of more relevance. Many of them would have been known to a purchaser, particularly as of the valuation date of 262 North. They reflect the settlement pattern in Iowa at the relevant valuation dates and thus indicate the market expectations which a purchaser might reasonably have in regard to Cession 262. The differences between -the lands in eastern Iowa and Cession 262 are relatively minor, and we 'have examined those differences in our findings of fact. [387] [Appendix 65-66]
Additional reasons for the Commission’s treatment of the evidence of the resales in eastern Iowa are set forth in the findings of fact in Docket 153 [Findings 25, 26, and 27— Appendix 80-82]. One of the most significant of these findings was the following:
As of the cession dates, a purchaser would estimate his return on investment by examining resales of lands in eastern Iowa (Noyce Areas 175, 226, and 224). A purchaser would know that while the [402] eastern Iowa lands were generally comparable to those in Cession 262, the eastern lands had certain advantages not enjoyed by the lands further west. * * * [Appendix 80]
*555 In summary, I would conclude that appellants have failed to demonstrate that the claimed inconsistency amounts to an error of law that justifies a remand in this case.

 The reference here and elsewhere to the Appendix Is to pertinent pages of the opinion and findings of fact of the Commission In this case and In Docket No. 153 of the Indian Claims Commission, all of which are printed in the Appendix to the Brief of the Appellants.

 A full statement of the data utilized by Dr. Murray Is contained In Commission finding 32 at page 38 of the Appendix.