**PETRO–CHEM MARKETING CO., INC.**

v.

**The UNITED STATES.**

No. 299–76.

United States Court of Claims.

July 18, 1979.

C. W. Wellen, Houston, Tex., attorney of record, for plaintiff. A. T. Blackshear, Jr., Ronald S. Webster, Alan E. Sherman and Fulbright & Jaworski, Houston, Tex., of counsel.

Kenneth R. Boiarsky, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr. and Donald H. Olson, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KUNZIG, Judge.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision (including an opinion, findings of fact, and conclusions of law) filed by Trial Judge Mastin G. White. After hearing oral argu-

ment and considering the exceptions and briefs of the parties, and the record, the court hereby adopts the trial judge's findings and opinion, as supplemented by the following, as the basis for its judgment in the case.[1]

Plaintiff has taken a number of exceptions to the trial judge's findings of fact, including his ultimate finding on reasonable compensation, on the ground that the unrebutted testimony of plaintiff's expert witness and witnesses from the petrochemical industry show that the compensation paid to plaintiff's officers was reasonable. We have considered and deny these exceptions on two grounds:

1. The uncontradicted testimony of an expert witness is not conclusive and may be rejected by the trial judge if he finds it to be unconvincing. *Toronto, Hamilton & Buffalo Nav. Co. v. United States,* 88 F.Supp. 1016, 1022, 116 Ct.Cl. 184, 207 (1950); *Sternberger v. United States,* 401 F.2d 1012, 1016, 185 Ct.Cl. 528, 535 (1968).

2. The fact that there is undisputed evidence that the compensation paid to the plaintiff's officer-shareholders was reasonable does not entitle plaintiff to deduct the compensation to the extent that it is in reality a "distribution of corporate earnings and not compensation for services rendered." *Charles McCandless Tile Serv. v. United States,* 422 F.2d 1336, 191 Ct.Cl. 108 (1970); *Klamath Medical Serv. Bureau v. Commissioner,* 29 T.C. 339 (1957), *aff'd* 261 F.2d 842 (9th Cir. 1958), *cert. denied* 359 U.S. 966, 79 S.Ct. 877, 3 L.Ed.2d 834 (1959); *Nor-Cal Adjusters v. Commissioner,* 30 T.C.M. 837 (1971).

On a review of the whole record, we find that the trial judge correctly determined that part of the payments which plaintiff made to or for the benefit of its officer-shareholders in 1973 as salaries, bonuses and contributions to the company's profit-sharing plan was, in reality, a distribution of profits. This ultimate finding of fact is fully supported by the following evidentiary facts:

1. The plaintiff is a closely held family corporation and careful scrutiny of the payments made to its officer-shareholders is warranted.

2. Plaintiff has never declared or paid any dividends to its shareholders in any amount since its formation.

3. Plaintiff's capitalization in relation to the extent of its earnings and profits was exceedingly small.

4. The annual bonuses which were paid to plaintiff's officer-shareholders exceeded their annual salaries and were computed near the end of each year on no apparent predetermined basis except the availability of funds.

We find that the facts in this case are remarkably similar to those in *McCandless, supra,* and conclude here as we did there that plaintiff has failed to discharge the burden which is imposed on it by the regulations by showing that the payments to its officer-shareholders were "purely for services."

Plaintiff has also excepted to a number of other findings made by the trial judge and to his failure to make findings requested by the plaintiff. We deny these exceptions on the ground that the findings made by the trial judge are supported by the record and that in instances where the trial judge failed to make findings requested by plaintiff, the requested findings covered matter which was immaterial and would not change the result, or, were contrary to the greater weight of the evidence. Plaintiff has not made the strong, affirmative showing that is necessary to overcome the presumption of correctness accorded to the trial judge's findings. *See Davis v. United States,* 164 Ct.Cl. 612 (1964).

Plaintiff contends that the high compensation to its officers was justified because they assumed the risk of personal liability arising out of possible defaults in

---

1. Although the court adopts the trial judge's findings, they are not printed herewith since his opinion and this *per curiam* opinion set forth the facts necessary for an understanding of the decision.

transactions, defects in the products they bought and sold, or negligence by the officers. The assumption of such liability apparently was necessary to the successful functioning of the business. In a business that had adequate working capital, either through initial contributions or retention of earnings, the corporation itself would have assumed that liability. The net worth of the corporation in 1973 was very low in relation to its high earnings and was wholly inadequate to cover the risks assumed by the officers. It is a reasonable inference from the record that the officers assumed such risks, because they found that it was more financially advantageous to them to do so than to set up adequate corporate reserves to cover such risks. The corporation cannot justify the large payments to its officers as appropriate to compensate them for assuming risks that a properly capitalized corporation itself would have assumed, where the lack of such capitalization resulted in substantial part from the very payments to the officers.

Finally, we reject plaintiff's suggestion that if the decision of the trial judge is permitted to stand, "it will come as a great shock to thousands of professional service corporations throughout the country consisting of lawyers, doctors, engineers and the like * * *." We find that in all of its activities and operations, plaintiff bore a much greater resemblance to a broker of commodities than to an organization of doctors, lawyers or engineers. It is undisputed that plaintiff bought and sold petro-chemicals. Although it did not maintain inventories, it took title to the chemicals and arranged to transport them from the premises of the manufacturer to the premises of the consumer. Therefore, it is unnecessary for us to decide whether a somewhat different result might have been reached in this case if plaintiff was entitled to the same treatment for tax purposes as an organization of doctors, lawyers or engineers, because it is abundantly clear that plaintiff is not a professional corporation organized under a state professional act.

Accordingly, the court concludes as a matter of law that plaintiff is entitled to recover to the extent determined by the trial judge, plus interest at the statutory rate, and judgment is entered to that effect. The amount of recovery is reserved for further proceedings before the trial judge pursuant to Rule 131(c).

## OPINION OF THE TRIAL JUDGE

WHITE, Senior Trial Judge:

This is another income tax case involving the reasonableness of amounts which a family-owned corporation paid as purported compensation to or for the benefit of members of the family who managed the affairs of the corporation, and which the corporation, in its income tax return, deducted as business expenses on the ground that such amounts constituted reasonable compensation for personal services rendered by the payees.

The plaintiff is a Texas corporation, with 1,500 shares of stock outstanding. The corporation is owned by Robert L. Bucher, Sr. (500 shares), by his wife, Mrs. Margaret Joan Bucher (500 shares), and by their two sons, Robert L. Bucher II (250 shares) and James Gary Bucher (250 shares). All four members of the Bucher family are officers and directors of the corporation, Robert L. Bucher, Sr., being president and treasurer of the corporation and also chairman of the board of directors.

Although nominally an officer (vice president and secretary) and a director of the corporation, Mrs. Margaret Joan Bucher has never taken an active part in the corporation's operations.

At all times relevant to this case, the executive and managerial functions, and all other business activities, of the plaintiff were conducted by—and only by—Robert L. Bucher, Sr., Robert L. Bucher II, and James Gary Bucher, except for the assistance of a receptionist-secretary and, occasionally, a part-time bookkeeper.

In 1973, the year that is involved in the present litigation, the plaintiff paid $162,-200 to Robert L. Bucher, Sr. ($67,200 as salary and $95,000 as bonus), $137,600 to

Robert L. Bucher II ($42,600 as salary and $95,000 as bonus), and $132,800 to James Gary Bucher ($37,800 as salary and $95,000 as bonus). In addition to the cash payments (as salary and bonus) which the plaintiff made to each of the Buchers in 1973, the plaintiff also contributed to the company's profit-sharing plan in 1973 an amount for the benefit of each Bucher that was equivalent to 15 percent of the cash payments to him.

The various cash payments to the Buchers, and the related contributions to the company's profit-sharing plan, were claimed by the plaintiff on its 1973 income tax return as business deductions, on the ground that such amounts constituted compensation for personal services rendered by the Buchers.

Upon audit of the plaintiff's income tax return for 1973, the Internal Revenue Service (among other things): allowed $113,460 as a proper deduction, and disallowed $48,740, of the $162,200 which the plaintiff paid to Robert L. Bucher, Sr.; allowed $52,800 as a proper deduction, and disallowed $84,800, of the $137,600 which the plaintiff paid to Robert L. Bucher II; allowed $45,600 as a proper deduction, and disallowed $87,200, of the $132,800 which the plaintiff paid to James Gary Bucher; and made proportionate allowances and disallowances with respect to the plaintiff's contributions to its profit-sharing plan for the benefit of the Messrs. Bucher.

As a result of its audit determinations, the Internal Revenue Service assessed against the plaintiff a total income tax deficiency of $121,948, plus interest thereon in the amount of $17,526.77, or a total assessment of $139,474.77. This assessment was paid by the plaintiff under protest on May 3, 1976.

The present action was subsequently instituted by the plaintiff to challenge the propriety of the actions by the Internal Revenue Service in disallowing, for income tax purposes, portions of the amounts paid by the plaintiff to or for the benefit of the Messrs. Bucher.

A major objective in this type of case, involving the reasonableness of executive compensation, is to ascertain (if possible) the amounts that ordinarily would be paid for similar services by similar enterprises under similar circumstances, and then use the results of the inquiry as a standard with which to compare the purported compensation in question. *R. J. Reynolds Tobacco Co. v. United States,* 149 F.Supp. 889, 897, 138 Ct.Cl. 1, 14 (1957), *cert. denied,* 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957); *A. C. Ball Co. v. United States,* 531 F.2d 993, 1003, 209 Ct.Cl. 223, 242 (1976). Unfortunately, the state of the record in the present case does not permit the use of this important factor of relevant comparison in determining the reasonableness of the purported compensation received by the Messrs. Bucher from the plaintiff in 1973. Although there is evidence in the record indicating that, in 1973, there were perhaps six or seven other companies in the United States trading in some of the products which the plaintiff was trading in at the time (the nature of the plaintiff's business will be explained later), the evidence does not show to what extent (if any) such companies were otherwise comparable to the plaintiff, or the extent (if any) to which the executives of such companies rendered services similar to those rendered by the Messrs. Bucher for the plaintiff, or the level of the compensation received by the executives of such companies.

In the absence of any persuasive comparative data, it apparently will be necessary in the present case to rely principally upon evidence in the record concerning the qualifications of the Messrs. Bucher, the nature of the services performed by them, and the responsibilities borne by them during the period in question. *Cf. Jones Bros. Bakery v. United States,* 188 Ct.Cl. 226, 245, 411 F.2d 1282, 1293 (1969); *Patton v. Commissioner,* 168 F.2d 28, 31 (6th Cir. 1948).

In 1973, and at the other times relevant to this case, the plaintiff was engaged in business as a "trader" in petro-chemicals (*e. g.,* benzene, toluene, and xylene) and their derivatives. The plaintiff maintained its headquarters in Houston, Texas.

A trade or deal in which the plaintiff was involved might originate when the plaintiff learned through an approach (frequently over the telephone) made by the plaintiff to a petro-chemical manufacturer, or made by a manufacturer to the plaintiff, that the manufacturer had on hand a specified quantity of a certain product which the manufacturer desired or was willing to sell at a designated price. The plaintiff would then make contacts with consumers of petro-chemical products in an attempt to locate a consumer that was willing to purchase the particular product at a price higher than that quoted to the plaintiff by the manufacturer. Upon locating such a consumer, the plaintiff would enter into a contract (usually oral) to purchase the product from the manufacturer, enter into a separate contract (also usually oral) to sell the product to the consumer, take title to the product, arrange and pay for the transportation of the product from the manufacturer's plant to the consumer's place of business (via railroad tankcar, tanktruck, barge, or ship, as might be appropriate), arrange and pay for insurance on the movement of the product, arrange and pay for any necessary inspection at origin or at destination, deliver the product to the consumer, collect from the consumer, and pay the manufacturer.

On the other hand, a trade or deal might originate when the plaintiff learned through an approach (frequently over the telephone) made by the plaintiff to a consumer of petro-chemical products, or made by a consumer to the plaintiff, that the consumer was in need of a specified quantity of a certain product and was willing to pay a designated price for it. The plaintiff would then get in touch with manufacturers of the particular product in an attempt to locate a manufacturer that had the desired quantity of the product on hand and was willing to sell it at a price lower than that which the consumer was willing to pay. Upon locating such a manufacturer, the plaintiff would enter into separate contracts (usually oral) with the manufacturer and with the consumer, and would then take steps similar to those outlined in the preceding paragraph of this opinion to consummate the deal.

The plaintiff did not maintain an inventory of petro-chemical products, and did not buy or sell such products on a speculative basis. The plaintiff did not enter into a contract to purchase a product from a manufacturer unless the plaintiff had already located a consumer that had indicated a willingness to buy such product from the plaintiff at a price advantageous to the plaintiff; and the plaintiff did not enter into a contract to sell a product to a consumer unless the plaintiff had already located a manufacturer that had indicated a willingness to make such product available to the plaintiff at a price advantageous to the plaintiff.

The plaintiff did not have long-term contracts with either manufacturers or consumers. Rather, it engaged in a "spot" type of business that involved a succession of deals whereby the plaintiff would contract to purchase a specified quantity of a product from a petro-chemical manufacturer, and would separately contract to sell the same quantity to a consumer.

The evidence in the record indicates that success in the business of trading in petro-chemical products is dependent to a very large degree upon the trader's reputation, personal contacts, and personal friendships among members of the petro-chemical industry. Accordingly, in conducting the business of the plaintiff, Robert L. Bucher, Sr., Robert L. Bucher II, and James Gary Bucher were very active in making new contacts, and in maintaining old contacts, among members of the petro-chemical industry throughout the world. They frequently travelled to such places as New York City, Los Angeles, Toronto, or wherever potential suppliers or customers might have their home offices. At such places, and also in Houston, where the plaintiff maintained its headquarters, each of the three Buchers attended luncheons, meetings, conventions, etc., and did a great amount of entertaining, in order to make new contacts and maintain old contacts.

As of 1973, Robert L. Bucher, Sr. ("Bucher Sr."), in particular, had earned an out-

standing reputation in the petro-chemical industry as an honest, trustworthy, knowledgeable, and innovative trader. After graduating from the Kansas City branch of the University of Missouri in 1943, with a major in chemistry, working as a chemist for Phillips Petroleum Company from 1943 until 1954 (except for service in the Navy during 1945–46), and then working for Skelly Oil Company from 1954 until 1960 as a salesman of special petroleum solids throughout the United States, Bucher Sr. became directly involved with petro-chemicals in 1960, when he left Skelly Oil Company and went to work for Delhi Taylor Company in Dallas, Texas, as midwestern regional manager of petro-chemical sales.

In 1963, Bucher Sr. went to work for C. J. Thibodeaux & Company; and later that year, acting for his employer, he set up a corporation, Petro-Chem Marketing Company, Inc., as a wholly-owned subsidiary of C. J. Thibodeaux & Company. The new corporation, under the management of Bucher Sr., engaged in business as a trader in petro-chemical products. By 1968, Bucher Sr. had changed the structure of the company and had converted it from a corporation into a partnership, known as Petro-Chem Marketing Company, of which Bucher Sr. was the managing partner, with a 50 percent ownership. The remaining 50 percent ownership of the partnership was divided among four other partners, who did not participate in the business of the partnership except to receive profits from its activities.

The partnership referred to in the preceding paragraph was dissolved, by agreement, at the end of 1969; and Bucher Sr. succeeded to the business theretofore conducted by the partnership. Having previously caused the plaintiff to be organized in Texas as a new corporation in August 1969, Bucher Sr. transferred the business to the plaintiff at the beginning of 1970. The plaintiff, headed by Bucher Sr. as president, as a shareholder, and as chairman of the board of directors, thereafter conducted the business at all times relevant to the case, including the year 1973.

Robert L. Bucher II ("Bucher II") attended Dartmouth College for 4 years and received a bachelor's degree, with a major in geology. He then attended the University of Utah and received a Ph.D. degree from that institution, with a major in geophysics. Bucher II went to work for the Petro-Chem Marketing Company partnership (previously referred to) in August 1969. Then, when the partnership was dissolved at the end of 1969 and the business was transferred by Bucher Sr. to the plaintiff at the beginning of 1970, Bucher II began working for the plaintiff on January 1, 1970, as an officer, as a shareholder, and as a director. He continued to work for the plaintiff in those capacities at all times relevant to the present litigation.

James Gary Bucher ("Gary Bucher") has a college degree, with a major in the biological sciences and with a background in chemistry through organic synthesis. He served for a time during the Vietnam conflict as an officer (ensign and, later, lieutenant j.g.) in the Coast Guard. This included service in Vietnam waters. While in the Coast Guard, he received some schooling relative to the carriage and handling of dangerous cargoes and hazardous materials; and he acquired experience in barge and ship operations. Gary Bucher began working full-time for the plaintiff in June 1971 as an officer, as a stockholder, and as a director. He continued to work for the plaintiff, in the capacities just mentioned, at all times relevant to this litigation.

As previously stated, the executive and managerial functions of the plaintiff—and, indeed, all other business activities of the plaintiff, except for the administrative details handled by a receptionist-secretary and occasionally, by a part-time bookkeeper—were conducted by Bucher Sr., Bucher II, and Gary Bucher. The evidence indicates that Bucher Sr. was the dominant figure among the three Buchers who conducted the affairs of the plaintiff; and that the initial approach to the plaintiff by a petrochemical manufacturer that wished to obtain the assistance of the plaintiff in moving a product, or the initial approach to the

plaintiff by a consumer of petro-chemical products that wished to obtain the assistance of the plaintiff in securing a product, was usually attributable to the outstanding reputation which Bucher Sr. had earned through the years in the petro-chemical industry for honesty, trustworthiness, extensive knowledge of the business and the people engaged in it, and resourcefulness. Once a business relationship with the plaintiff was established, a manufacturer or a consumer, in making subsequent approaches to the plaintiff, generally preferred to deal with Bucher Sr., although by 1973 Bucher II and Gary Bucher had acquired sufficient expertise, and were sufficiently well known in the petro-chemical industry, that manufacturers and consumers did not hesitate to transact business with them whenever Bucher Sr. was not available. In such a situation, a manufacturer or consumer assumed that Bucher II or Gary Bucher would obtain from Bucher Sr. any approval that might be required to bind the plaintiff on a transaction negotiated with one of the sons.

By 1973, each of the three Buchers who managed the business activities of the plaintiff was fully capable of handling— and occasionally did handle—any aspect of a trade or deal. As a general proposition, however, Bucher Sr. assumed the major responsibility for purchases and sales (although Bucher II and Gary Bucher also purchased and sold products), Bucher II assumed the major responsibility for the financial aspects of transactions, and Gary Bucher assumed the major responsibility for the transportation aspects of transactions.

Each of the three Buchers devoted to the plaintiff's business each week many working hours over and above the customary 40.

In addition to providing the plaintiff with their expertise in arranging and consummating trades or deals, and with their excellent reputations and wide-ranging contacts in the petro-chemical industry, the Messrs. Bucher also personally assumed for the plaintiff large financial risks in conducting the plaintiff's business. This was necessary because (for reasons that will be mentioned later) the plaintiff's net worth was small for a successful company, and was wholly inadequate to cover the financial risks involved in functioning as a trader in the petro-chemical industry. For example, during 1973 the plaintiff's purchases and sales totaled approximately 13.6 million dollars, whereas the plaintiff's net worth was only $45,770 at the beginning of 1973 and $66,181 at the end of that year.

In connection with each trade or deal made by the plaintiff for the purchase and sale of a petro-chemical product, there existed a risk that the supplier would back out of its agreement to provide the product to the plaintiff, or that the customer would back out of its agreement to purchase the product from the plaintiff, or that the product furnished by the supplier would not meet the specifications prescribed by the customer, or that the product would become contaminated during the transportation process and cause a great loss to the customer. The Messrs. Bucher acted under the belief that if any such contingency should occur, they were morally obligated as individuals to fulfill the plaintiff's obligation in the transaction, and they stood ready to do so in connection with each trade or deal made by the plaintiff. The suppliers and customers that dealt with the plaintiff expected the Buchers to—and were confident that the Buchers would—be personally responsible for carrying out all contracts made and all obligations assumed by the plaintiff. If the Buchers had failed to honor such an obligation, the failure would have caused serious damage to their reputations for trustworthiness in the petro-chemical industry, and would have had a seriously adverse effect on the plaintiff's business.

It was the policy and practice of the Messrs. Bucher to keep the plaintiff's net worth at a modest level, for a successful company. At the beginning of each year, Bucher II, who was mainly in charge of the plaintiff's finances, would propose (subject to the approval of Bucher Sr. and Gary Bucher) the respective amounts which the plaintiff should pay the Messrs. Bucher during the particular year as their salaries.

Then, in November of each year, when it was possible to determine with considerable accuracy the approximate amount of money that the plaintiff would make during the year, over and above the Buchers' salaries and the other expenses of the corporation, Bucher Sr., Bucher II, and Gary Bucher would jointly discuss and determine how much of the available money should be paid to them by the plaintiff under the denomination of bonuses, and how much should be left in the corporation. They would leave in the corporation only such sum as they regarded as constituting reasonable earnings on the modest amount of capital invested in the corporation, thus providing a fund that would be available to pay bills and defray other obligations of the corporation.

At the beginning of 1973, for example, annual salaries for the Messrs. Bucher were fixed at $67,200 for Bucher Sr., $42,600 for Bucher II, and $37,800 for Gary Bucher. Subsequently, in November of that year, the Messrs. Bucher decided that, as 1973 had been a profitable year (the gross profit for the year amounted to $575,788), the plaintiff should pay each of them a bonus in the amount of $95,000. Also, as previously explained, the plaintiff paid into the company's profit-sharing plan, for the benefit of the Buchers, amounts equivalent to 15 percent of their respective salaries and bonuses for the year. After the purported compensation of the Messrs. Bucher and all the 1973 expenses of the corporation not involved in the present litigation were paid, there was left in the corporation a net income before taxes of $26,255 and a net income after taxes of $20,411.

The plaintiff did not, in 1973, or at any other time, pay dividends to its shareholders.

For purposes of comparison, it may be noted that the annual salaries of the Messrs. Bucher for 1972 were fixed at $45,-600 for Bucher Sr., $19,200 for Bucher II, $15,600 for Gary Bucher, and that their respective bonuses were $9,120, $3,840, and $3,120. The plaintiff's purchases and sales in 1972 totaled approximately 10.4 million dollars and its gross profit amounted to $177,920, as contrasted with purchases and sales totaling approximately 13.6 million dollars and a gross profit of $575,788 in 1973.

The evidence in the record indicates that the plaintiff's increased business and profitability in 1973 were due in part to chaotic conditions prevailing in the petro-chemical industry, which created a favorable opportunity for traders with knowledge and expertise to obtain business and make profits; and in part to the exceptional knowledge and expertise of the Messrs. Bucher in conducting the business activities of the plaintiff during a period of chaos in the petro-chemical industry.

The plaintiff's brief states that this case "presents the novel issue of whether a unique corporate enterprise, whose income is earned solely by the personal services performed by its officers, should be permitted to pay (and receive a deduction for payment of) all of its income (less amounts retained in the business for working capital, and for other business uses, including business risks) to those officers directly as salary and indirectly as profit-sharing plan contributions." The determination of this novel issue, however, must be reserved for another case. It appears from the present record that the plaintiff's income in 1973 was not earned *solely* by the personal services performed by the Messrs. Bucher.

As mentioned earlier in the opinion, the evidence indicates that although the Messrs. Bucher, with their exceptional expertise, rendered extremely valuable services for the plaintiff, the plaintiff's large volume of business in 1973 (approximately 13.6 million dollars in purchases and sales) and large gross profit ($575,788) were attributable in part to the chaotic conditions prevailing at the time in the petro-chemical industry. In this connection, it is appropriate to note that there is nothing in the record to show that the Messrs. Bucher were less expert or worked less hard in 1972 than in 1973, and yet the plaintiff's volume of business in 1972 amounted to the substantially lower figure of approximately 10.4 million dollars

in purchases and sales, and the plaintiff's gross profit for that year was the much smaller figure of $177,920. Conversely, there is nothing in the record to show that the Messrs. Bucher were more expert or worked harder in 1974 than in 1973 (or 1972), and yet the plaintiff's volume of business in 1974 jumped to approximately 49.2 million dollars in purchases and sales, and the plaintiff's gross profit for that year jumped to approximately $3,000,000 (more than five times greater than the 1973 profit). These variations in volume of business and gross profit indicate rather convincingly that changing conditions in the market place were an important factor in establishing the level of the plaintiff's income in the various years, and that the plaintiff's profitability in 1973 (the year in issue) was not attributable *solely* to the personal services rendered by the Messrs. Bucher.

From the circumstance that the plaintiff, a family-owned and prosperous corporation, did not pay dividends (*cf. Miles Conley Co. v. Commissioner,* 173 F.2d 958, 960 (4th Cir. 1949)), the circumstance that the major part of the purported compensation to members of the family for 1973 was decided upon in November, near the end of the year, when it was apparent that 1973 was a very profitable year for the plaintiff. (*cf. Ecco High Frequency Corp. v. Commissioner,* 167 F.2d 583, 585 (2d Cir. 1948), *cert. denied,* 335 U.S. 825, 69 S.Ct. 49, 93 L.Ed. 379 (1948)), and the circumstance that the November 1973 payments to the Buchers absorbed practically all of the plaintiff's available earnings for 1973, it is reasonable to infer that the purported bonus payments in November constituted, at least in part, a distribution of profits rather than compensation for services performed.

■ It is concluded, therefore, on a careful study of the entire record, that the payments which the plaintiff made to or for the benefit of the Messrs. Bucher in 1973, as salaries, bonuses, and contributions for their benefit to the company's profit-sharing plan, were in part compensation for the very valuable personal services rendered by the Messrs. Bucher during 1973, and were in part distributions of profits. The court's task in the present case is to determine what portions of such payments constituted reasonable compensation for personal services rendered by the Messrs. Bucher as only those portions could properly be deducted by the plaintiff for income tax purposes under section 162(a)(1) of the Internal Revenue Code of 1954 (26 U.S.C. § 162(a)(1) (1976)).

■ The determinations by the Internal Revenue Service that the amounts of $113,460, $52,800, and $45,600 (plus sums equivalent to 15 percent of such amounts) constituted reasonable compensation for personal services rendered by Bucher Sr., Bucher II, and Gary Bucher, respectively, must be presumed to be correct, unless there is clear evidence establishing the impropriety of such determinations, inasmuch as a presumption of regularity supports the official acts of public officers. *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Northlich, Stolley Inc. v. United States,* 368 F.2d 272, 277, 177 Ct.Cl. 435, 442 (1966).

Insofar as the compensation of Bucher Sr. is concerned, it is my opinion that the record does not contain the sort of clear evidence that would be necessary to overcome the presumption of correctness which supports the administrative determination that $113,460 (plus a sum equivalent to 15 percent of that amount) constituted reasonable compensation for the personal services which he rendered for the plaintiff in 1973.

With respect to the matter of reasonable compensation for Bucher II and Gary Bucher, however, it should be noted that when they and Bucher Sr., at the beginning of 1973, fixed the annual salaries for themselves as the active officers and managers of the plaintiff, the figures chosen by the Messrs. Bucher reflected their joint conclusion that the services of Bucher II to the plaintiff were worth 63.4 percent as much as the services of Bucher Sr., and that the services of Gary Bucher were worth 56.25 percent as much as. the services of Bucher

Sr. It seems obvious that the three Buchers were in a much better position than anyone else to evaluate properly the comparative value of their respective services to the plaintiff. Accordingly, it is my view that the percentages previously mentioned should be applied to the IRS figure of $113,460 for Bucher Sr. in determining the amounts of reasonable compensation for Bucher II and Gary Bucher. This computation would result in a figure of $71,934 as reasonable compensation for Bucher II and in a figure of $63,821 for Gary Bucher (plus sums equivalent to 15 percent of the respective amounts stated).

Accordingly, it is concluded that the plaintiff, for income tax purposes in 1973, was entitled to deduct a total of $249,215 as reasonable compensation for personal services rendered by the Messrs. Bucher (instead of $211,860, as allowed by the IRS), plus 15 percent of $249,215, or $37,373, as allowable contributions to the company's profit-sharing plan for the benefit of the Buchers (instead of $31,779, as allowed by the IRS).

It necessarily follows that the plaintiff is entitled to recover in this litigation, on the basis indicated in the preceding paragraph. The amount of the recovery will be determined in subsequent proceedings under Rule 131(c).

The plaintiff's request that reasonable attorneys' fees be included in the recovery, by virtue of the Civil Rights Attorney's Fees Award Act of 1976 (Pub.L. No. 94–559; 90 Stat. 2641), must be rejected in view of this court's decision in *Aparacor, Inc. v. United States,* 215 Ct.Cl. 596, 571 F.2d 552 (1978).