HELEN L. FOOS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; COURTNEY F. FOOS, JR. AND CONSTANCE FOOS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Foos v. Comm'r
Docket Nos. 2986-79, 3047-79. United States Tax Court
T.C. Memo 1981-61; 1981 Tax Ct. Memo LEXIS 680; 41 T.C.M. (CCH) 863; T.C.M. (RIA) 81061; February 18, 1981. *682 Thomas R. Frantz,Donald H. Clark and Morris E. Flater, Jr., for the petitioners. John C. McDougal, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases respondent determined the following deficiencies in the Federal income taxes of petitioners: Petitioner
Docket No.
Year
Amount
Helen L. Foos
2986-79
1974
$ 151,502.02
1975
536,280.96
1976
192,584.70
Courtney F.
3047-79
1974
$ 89,924.58
Foos, Jr. and
1975
554.279.42
Constance Foos
1976
172,548.92
The issues for decision are: 1. Whether amounts received by Helen L. Foos and Courtney F. Foos, Jr. from the Courtney F. Foos Coal Co. during 1974, 1975 and 1976 represented reasonable compensation for services rendered, to which the 50 percent maximum tax on earned income is applicable under section 1348 [1], or represented distributions of corporate earnings and profits. 2. Whether $ 15,000 per year for the calendar years 1974, 1975 and *683 1976 constituted a reasonable allowance for personal services rendered by Courtney F. Foos, Jr. to his horse racing and breeding operations for the purposes of section 1348. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and the accompanying exhibits are incorporated herein by this reference. Courtney F. Foos, Jr. (Courtney) and Constance Foos, husband and wife, resided in Phoenixville, Pennsylvania at the time they filed their petition herein. Their joint Federal income tax returns were prepared on a calendar year basis for the years 1974, 1975 and 1976. Helen L. Foos (Mrs. Foos), Courtney's mother, resided in Virginia Beach, Virginia at the time she filed her petition herein. Her Federal income tax returns were prepared on a calendar year basis for the years 1974, 1975 and 1976. Courtney and Mrs. Foos will sometimes hereinafter be referred to as petitioners or the Fooses. Facts Relating To Issue 1
Courtney was president, director, full-time employee and 50 percent shareholder of the Courtney F. Foos Coal Co. Inc. (Company) during all relevant periods. Mrs. Foos was secretary-treasurer, director, full-time *684 employee and 50 percent shareholder of the Company during all relevant periods. The Company elected to be taxed under Subchapter S for the years at issue. At all times since its incorporation in 1953 the Company has been engaged in the coal brokerage business. The Company buys and sells coal on its own account, making its profit on the spread between the price at which it purchases coal from the mines and the price at which it sells coal to users. It acts as a principal in these transactions rather than as a agent. Courtney, Mrs. Foos and Courtney F. Foos, Sr. (Mr. Foos, Sr.) have been in the coal sales and brokerage business virtually all their lives. Mr. Foos, Sr., now deceased, was a successful sales agent for the Valley Camp Coal Co. (Valley) from 1932 to 1944. As such, he was required to travel constantly, generally leaving the then family home on Sunday and not returning until the following Saturday. Mrs. Foos accompanied him on almost all of his trips. Mr. Foos, Sr. and Mrs. Foos would travel throughout the eastern United States searching for customers for the Valley's coal production. Potential customers were obtained through leads or by simply knocking on doors *685 of any businesses, such as utility companies, which obviously burned coal ("looking for smokestacks" in the trade). After locating a potential customer, Mr. Foos, Sr. arranged a sales meeting with the persons authorized to purchase coal or with the boiler engineers. At the conclusion of the meeting Mrs. Foos, who attended the meetings, would prepare a report covering the relevant technical information, key personnel, and other pertinent data, and would memorize much of it. As a child Courtney was taken with his parents on business trips to the mines and to visit customers. He continued to accompany his parents on such trips during school vacations and in the summer. While growing up, he often went into the mines with his mother and sat in on many meetings with mine operators and customers. Mrs. Foos continued to assist her husband after he left Valley in 1944 to become a partner in the Calvert Coal Co. (Calvert), which was engaged solely in the coal brokerage business. They worked as a team locating and negotiating with the mines as well as seeking out new customers and servicing old ones. In addition, Mrs. Foos went down into the mines to perform the necessary mine inspections. *686 Mr. Foos, Sr. could not do this because of a dread of going underground he developed after surviving a mining accident years earlier. During this period Mrs. Foos developed a an in-depth knowledge of mining companies. She met with key personnel, and inspected the equipment as well as the type of coal produced. She studied the different coal seams, how the coal was processed and handled and the mine's general methods of operations and problem areas. It usually took Mr. Foos, Sr. and Mrs. Foos many years of customer solicitation before receiving a first order. It was often necessary to visit the purchasing agent many times and develop a personal relationship with him. Competition was fierce. Before obtaining an order, they generally visited the customer's plant and discussed the details regarding the type of coal burned, type of equipment, nature of the problems encountered with coal and other technical matters. They generally called on each customer and potential customer every three months. Mr. Foos, Sr. developed severe health problems which caused him to leave Calvert in 1952. When Mrs. Foos learned her husband had only a few years to live she developed the predecessor *687 to the Company in 1952. She operated it with her husband until incorporation of the Company in 1953. She contributed $ 17,600 to the capital of the company which sum was, and has continued to be (although reduced to $ 13,800 in 1969), the Company's only contributed capital. In 1953 Mr. Foos, Sr. suffered a heart attack. That year Courtney was taken out of high school and at the age of sixteen began to work for the Company calling on customers with his mother. During his school summer vacations Courtney's mother sent him to work in the coal mines to learn the business from the ground up. He attended the University of Pennsylvania Wharton School of Finance on a full academic scholarship. During his sophomore and junior years, at Wharton, Courtney worked part-time making afternoon sales calls on prospective customers. For several years Mr. Foos, Sr. and Mrs. Foos were the Company's only full-time employees. Until Mr. Foos, Sr. became seriously ill in 1956, the family worked together and channeled their efforts toward the development of Courtney's knowledge of the business. During Mr. Foos, Sr., last illness, the Company hired two coal salesmen, but both had to be discharged. *688 because they could not develop the important relationships with the producers and the customers. Several months before his father's death in 1957, Courtney was compelled to leave college to assist his mother in the Company's business. He continued his classes at night, often making sales calls during the day and between classes at night. Because of his work schedule it took him five years to complete his studies and earn his Bachelor's degree. Following the death of Mr. Foos, Sr., Courtney became a full-time employee, and his mother's efforts to educate him in the industry intensified. She took him on calls to the mines, as well as to coal trade seminars and conventions, where she was the only woman. She spoon fed him the knowledge and experience she had obtained over the years. Aside from an astute pricing strategy, there are a number of factors which are important to successful coal brokering. First, it is necessary to acquire extensive knowledge about the sources of supply, the characteristics of each type of coal mined and the applications of each variety. It is also necessary to be able to generate sales by locating the proper customer of each type of coal, by building *689 up the customer's confidence in the broker to make a first purchase, by assuring through laboratory testing that the coal sold by the broker will meet the customer's needs, and by maintaining the customer's confidence. Mrs. Foos provided Courtney with instructions on sales technique and a potential customer list of several hundred names which she and Mr. Foos, Sr. had developed through the years. In addition, she accompanied him on many sales calls, instructing and critiquing him. Gradually he took a more active role in the sales discussions. When he began to make calls alone, she would brief him regarding what the customer needed, what offer to make, and generally how to handle the matter. With each corporate customer, the Fooses generally dealt with a number of employees in several departments. Customer requirements change constantly due to modifications of equipment, machine breakdowns, changes in environmental regulations, and other factors. Further, outside influences, such as alternate energy sources and cash flow problems, can cause customers to modify buying habits. A broker must not only maintain current information on the price of the various types of coal, but must *690 also update his knowledge of a customer in order to know if and when real adjustments are necessary in order to retain the source of demand. For example, a customer with a large inventory of coal will not be willing to pay as high a price for coal as it will if its inventory is low. During the period 1957 to 1968, Mrs. Foos also provided Courtney with instructions on buying strategy, she introduced him to the proper people at the mines, and critiqued his negotiations and bargaining sessions with the mine operators. Between 1958 and 1962 Courtney concentrated on sales, although he also made numerious purchasing trips to the mines. Between 1962 and 1965 he concentrated on developing his contacts with the producers, while Mrs. Foos tended to the sales. On his trips to the mining companies Courtney would leave home on Sunday afternoon, and return the following Saturday afternoon. He would make anywhere from one to three such trips a month. Courtney developed a rapport with the mine operators during these trips, often staying in their homes, inspecting mines with them and advising them on personal and business matters. Although living conditions at the mines were harsh, Courtney *691 believed his presence there was necessary since the mine operators often would sell only to people whom they knew and trusted. On one occasion Courtney encountered a situation where 300 miners on strike had shut down a mine for two years.He organized the miners into a cooperative which acquired the mine and recommenced operations. Because of his efforts the mine remained a loyal supplier of the Company for years. Courtney frequently telephoned his mother from the mines to discuss strategy and coordinate efforts and after each trip he reviewed with her the data he collected and the contracts he made. On these trips to the field Courtney canvassed the mining companies learning as much as he could about those which showed promise. He became acquainted with the key individuals at each mining company learning about their trustworthiness and management policies. He obtained a complete knowledge of the coal which each mine produced: how many seams of coal a mining company worked, the characteristics of the coal from each seam, and the variances likely to occur within a seam. A detailed knowledge of the type of coal being bought is important to a coal broker because the uses and *692 value of the coal are determined by its physical characteristics and because coal consumers often have exacting requirements. The grade and quality of a specified type of coal may differ from county to county and from one part of a mine, or one part of a seam, to another. Hence, coal from a particular mining company may vary from time to time. Courtney constantly monitored the coal being bought to assure it was within the consumer's requirements. The following examples illustrate the technical nature of the Company's business and the importance of having precise knowledge regarding each type of coal: (a) The Sewell Seam coal is generally low sulphur, low ash and high fusing. If it were used in equipment requiring low fusing coal, it would not melt, nor run out of the boiler through the tap into the ash pit as it should. Rather, the ash would remain solid, causing the equipment to clog and shut down and possibly causing a serious explosion. (b) The Sewell Seam coal will not work in electrostatic precipitators because the sulphur content is too low.Generally its uses are limited to spreader stokers, underfeed stokers and old fashioned equipment. If lower fusing coal is *693 used in this equipment, the ash will melt, run through various parts of the equipment, and eventually "freeze," causing extensive damage and the likelihood of an explosion. (c) On the other hand, Pittsburgh and Redstone Seam coal, which are high in sulphur and high in ash, work well in electostatic precipitators. However, it is illegal to ship such coal into certain cities and counties because of environmental controls. (d) The coal must be matched to the consumer's equipment. While all bituminous coal is "soft," some of it is harder than others. The harder variety, such as the Pittsburgh Seam, may not be used in certain types of equipment, such as pulverizers, because the hardness will break the machine. By contrast, the softer variety, such as Freeport Seam, is very fine and thus can cause other types of equipment, such as a spreader or underfeed stoker, to clog. While at the mining companies, Courtney made some sales by telephone; however, the Company also relied extensively on sales made by Mrs. Foos and outside salesmen. The latter were paid by commission. Since all brokerage transactions are handled by telephone, Courtney and Mrs. Foos have always been able to make *694 sales and purchases while on the road. As Courtney secured his contacts at the mines, he spent progressively less time visiting them. The Fooses then began to concentrate on the development of customers with an eye to reducing the need for outside salesmen. Beginning in 1965, as Courtney developed his relationships and devoted more time to sales, Mrs. Foos shifted more of her efforts to administrative matters. In 1968-1969 the Company's volume increased substantially, as did the demands upon Mrs. Foos regarding her administrative, accounting, financial, and troubleshooting responsibilities. She has nevertheless continued to advise Courtney in all phases of the operations, consulting with him on a regular basis. Additionally, because she has maintained her acquaintances and friendships with her old customers, she has been able to fill in for Courtney when necessary. Courtney and Mrs. Foos maintain a complete "data bank" relating to each customer, including its requirements, needs and personnel. The Fooses must constantly change their approaches based on changes in machinery, management, and other relevant factors. They also retain various written schedules, such as train *695 schedules, shipping calendars and purchase and sales order schedules, and a quotation and coal offer file that includes pertinent information which must be updated constantly. Few of the written records are kept in permanent form and most are discarded after approximately one year. To maximize gross profits the negotiations with buyers and sellers must be skillfully handled. This requires a day-to-day knowledge of the parties, their needs, and their capabilities.A sample transaction which the Company handles is as follows: (a) Courtney receives an purchase order for 1,000 tons of coal to be delivered to a customer at its Pittsburgh, Pennsylvania, plant. Upon receipt of the order, Courtney will order by telephone the proper coal from one or more of the mines with which the Company does business in West Virginia.The Company's purchasers are usually known at, or shortly after, the time the coal is ordered from the mine, so that the coal, when shipped, makes a continuous journey from the mine to the purchaser's plant. Accordingly, the Company has no coal inventories. (b) Courtney or Mrs. Foos would then contact the carrier to confirm the freight rates and assure that the transportation *696 and routing of the coal are proper.If time permits, Courtney will have the coal analyzed by a commercial laboratory while it is in a pile at the mine, and again after it is loaded on cars in order to be certain that the coal ordered was in fact shipped. Where time does not permit, the coal will be analyzed only after loading. Each day Courtney informs a laboratory which mines are loading coal for the Company and orders the laboratory to sample each carload of coal, specifying which tests to perform in order to determine if the coal meets the customer's needs and specifications. (c) The mine is directed to ship the coal to the Company at the weighing scales in Cumberland, Maryland. All coal with which the Company deals must pass through these scales. The coal is sent to the Company so that the mine will not learn the name of the customer. Otherwise, a number of the mines would attempt to deal directly with customers and leave the broker out of the transaction. The Company has legal title to the coal for the brief period it is en route between Cumberland scales and its ultimate destination. (d) If the correct coal has been shipped, Courtney will contact employees at the scales *697 in Cumberland, Maryland, and tell them where to forward the coal from that point. After the coal arrives at a customer's place of business, Courtney will follow up to assure that the purchasing agent as well as the plant personnel are satisfied. (e) If the correct coal has not been shipped, such as happens in those instances when the laboratory report is not received by Courtney until after the shipment has left the mine and the report indicates that the coal does not meet the customer's specifications, then the coal must be diverted to another customer who is able to use it. Courtney would then try to locate an alternative customer. If successful in time, he would have to reroute the coal, recompute the freight charges and, in some cases, renegotiate the purchase price with the mine. If the improper coal has passed the point where it is incapable of being diverted, Courtney must then decide whether (1) the coal may be sold to the customer at a discounted price, (2) it must be backhauled to the mine, or (3) it may be sold to another customer at the original destination point. (f) Occasionally, a mine may call Courtney and request that he purchase and sell several thousand tons *698 of their production. In these cases Courtney must make a market by promoting this particular coal among customers and potential customers whose needs match the specifications of the coal. If neither Courtney nor Mrs. Foos is familiar with the individuals operating the mine, one of them immediately runs a check on the operators through their banking contacts. further, Courtney or Mrs. Foos consults with the railroads and other brokers to learn as much as possible about the operators. Finally, they send a laboratory technician to sample the mine's coal. Only after satisfying themselves with regard to these matters will they attempt to purchase and sell the mine's coal. (g) If Courtney or Mrs. Foos has made an error in the process, either in freight rates, misapplication of coal, or the like, the Company will bear the loss. If the mine had made an error by shipping nonconforming coal before the analysis reports were available, then, as a matter of custom in the trade, the Company has no liability to the buyer. The Fooses' ability to lessen the effect of any mine mistake by rapidly locating alternate buyers (for which the shipped coal would be suitable) helps minimize risk to the *699 mines and is an income producing factor in the Company's business. Until 1969 Courtney and Mrs. Foos handled all aspects of the Company's business jointly with each having primary responsibility in certain areas of operations. Since then, although they coordinate all aspects of the Company business, they have divided more formally responsibilities for Company operations.Mrs. Foos handles the administrative and financial matters from her office in Virginia Beach, Virginia; Courtney handles sales and purchases from his office in Phoenixville, Pennsylvania. Courtney's duties and responsibilities include, but are not limited to: (a) Locating potential customers and mines, convincing them to do business with the Company, and obtaining as much information as possible about their operations, and personnel. (b) Establishing and maintaining knowledge of the quality, characteristics, grade, type and uses of coal produced by the mines with which the Company deals. (c) Maintaining quality control with the assistance of coal analysis by independent laboratories. (d) Locating Coal having specific characteristics in response to a customer's purchase order. (e) Locating customers *700 for a particular mine's coal production. (f) Negotiating acceptable prices for the purchase and sales sides of the equation, making contacts, and handling shipping. (g) When necessary, diverting coal to an alternative purchaser if coal having the wrong characteristics is shipped. (h) Performing follow-up duties to make certain that both buyer and seller are pleased with the results of the transaction, and to update his knowledge of each party's requirements. (i) Maintaining contacts with customers and suppliers by personally calling mine operators at least once every two weeks and customers at least once a month. Mrs. Foos throughout the relevant period managed the Company's Virginia office with primary responsibility for accounting, financial and administrative matters. Her other duties and responsibilities include, but are not limited to: (a) Conferring with Courtney to develop marketing, purchasing, pricing, and routing strategy. (b) Substituting for Courtney in sales and purchases when necessary. Because Mrs. Foos is fully qualified and maintains current information on all of the mines and customers, the mine operators and customers can call her when problems *701 arise. (c) Handling routing when Courtney is too busy with other Company matters, and, when necessary, diverting coal if coal having the wrong characteristics is shipped. (d) Maintaining essentially the same data bank as that possessed by Courtney, including lists of purchasers and suppliers, and information regarding routing, freight rates, pricing, etc. (e) Troubleshooting when problems arise. (f) Handling sensitive issues involving mine or customer relationships. Only Courtney and Mrs. Foos have total authority to buy and sell coal for the Company and to make any other contract for the Company. No other employee of the Company has this authority. During the years in issue the Company employed four to eight full-time employees, other than Courtney and Mrs. Foos, and a few part-time employees. These employees worked as secretaries, bookkeepers and clerks. Two to three employees worked in the Pennsylvania office, and the remainder worked in the Virginia office. None of the Company's employees, other than the Fooses, were skilled in brokering coal. For the Company's 1974 and 1976 fiscal years the Fooses generally worked from early morning to 6 p.m. every day and *702 two to four hours in the evening. Further, they were on call and, in fact, were called around the clock. During the period roughly coinciding with the fiscal year ended March 31, 1975, the Fooses had to work exceptionally long hours due to substantially increased demand from customers to purchase coal; increased need for constant contact with the sources of supply because other brokers and customers were attempting to lure mine operators from the Fooses with "get rich quick" schemes; more negotiations and a greater need to keep abreast of prices; increased difficulties in obtaining railroad cars for shipment; and substantially increased administrative and accounting volume and problem areas, such as poor quality control by suppliers, failure of some suppliers to honor commitments, lost railroad cars, and attempted cheating by some suppliers. Because of their team approach, the Fooses must collaborate often. Generally, they have two one-hour telephone conferences each day: one in the morning and one in the evening at 4:30 p.m., or later, when they discuss pricing, strategy, processing, and administrative matters. They also call each other two or three times a day on other matters. *703 When Courtney is traveling, he may not call until 10:00 p.m., and they may have to confer until 1:00 a.m. to handle the day's business. Because of the nature of the Company's business, the Fooses can perform most duties anywhere they have access to a telephone. Like most brokers, they use the telephone extensively for buying and selling, arranging for the transportation, and for the analysis of coal. The Company incurred telephone bills totaling $ 23,883, $ 25,388, and $ 27,275, respectively, during fiscal years ending March 31, 1974, March 31, 1975, and March 31, 1976, and made or accepted many long distance calls during this period. Approximately 19,212 long distance calls were made by Courtney from the Pennsylvania office or while on the road and 9,939 long distance calls were made by Mrs. Foos from the Virginia office, an average of 18 long distance calls every day for three years by Courtney and 9 calls every day by Mrs. Foos. In addition to the dictation and other matters to which Courtney must attend, he begins each work day with a list of approximately 20 to 40 calls (long distance and local) which must be made that day. This list is generally compiled with his mother's *704 assistance the night before. Mrs. Foos begins receiving calls the first thing in the morning at her home, and the calls continue throughout the day. Mrs. Foos accepts almost every incoming call to the Virginia office, which during the years in issue at least equalled the outgoing long distance calls from the Virginia office. The Fooses are called on the average of several times a week late in the night by coal producers, rail companies and customers for business emergencies, such as improper diversion of coal by the railroad, inability to ship by the mines, refusal of coal by a customer, and even for personal problems. Because of her preoccupation with her duties, Mrs. Foos has never taken a vacation since she started the family business in 1953. Although Courtney has taken one or two weeks of vacation each year, he must work via telephone several hours each day while on vacation, and is subject to recall. For example, in 1957 his mother called him home from his honeymoon because of a developing sales opportunity. Neither has had much social or family life since entering the family business. Mrs. Foos had only one outside activity during the relevant period--a judo club *705 located next to her office. To break from the coal business, she tried to devote a portion of two evenings a week to teaching judo to children. During the relevant period Courtney was involved in only two outside activities. He played tennis several times a week and he owned a horse racing and breeding operation, which is more fully addressed later herein. The duties and responsibilities of the Fooses are more extensive than those of many other brokers in the coal business. The Fooses do the work that, in other coal brokering companies, may be carried out by freight, expediting, accounting, administrative, and technical personnel. The Fooses have sold almost all the coal sold by the Company since 1957 when Courtney became a full-time employee. If the Company had employed coal salesmen other than the Fooses, it would have to pay each salesman his expenses and a commission of fifty percent (50%) of the Company's profit on any coal sold. In fact, the Company paid the four outside salesmen it previously employed on that basis. The Company has also paid finder's fees to agents who obtain purchasable coal for it. These commissions have, in some instances, been $ .10 per ton of *706 coal. The Company has used these purchasing agents to build up its number of suppliers. Although the Company deals only in bituminous coal, the varying types and requirements of equipment utilized by the Company's customers require different types, grades and quality of bituminous coal with differing characteristics. Generally, these are three types of bituminous coal with which the Company deals: steam coal, metallurgical coal, and reclamation coal. Within those general categories, the Company handles the full range of available coal. During the years in issue, the Company had no longer-term contracts for the purchase or sale of coal, but dealt exclusively in the spot market. There is no set price for coal because it is not a fungible commodity. The price per ton ranges widely depending on its characteristics, quality, type, grade, uses, supply and demand. During the relevant period the Company sold coal to between 13 to 20 customers and bought coal from between 32 to 46 West Virginia and Pennsylvania mines at any given time. The size of any particular order varied from 1 to 100 carload lots. Coal prices remained extremely stable during the approximately 20-year period prior *707 to 1970. In 1969, the average delivered price of coal sold in the United States was $ 4.99 per ton, exactly what it had been in 1948, although in the intervening years prices did fluctuate slightly. The average delivered price per ton dropped from $ 4.99 in 1948 to $ 4.39 in 1963. But as electric utility and export demand for coal increased in the 1964-1974 period, the price rose back to $ 4.99 in 1969 and jumped 25 percent in 1970 to $ 6.26. The average price continued to rise gradually during the early 1970's, approximately another 36 percent by 1973. During 1974, which covered the greate part of the Company's fiscal year ended March 31, 1975, there was a tremedous surge of demand resulting from a combination of factors, including the Arab oil embargo of 1973, the subsequent Organization of Petroleum Exporting Countries price increases, anticipation of a coal miners' strike in October, 1974, planned reconversions by consumers from oil to coal, and the lifting of price controls on coal.These factors drove prices sharply upward. After the oil embargo concluded and the miners' strike ended, demand began to slacken off until the second half of 1977 when the point of over-supply *708 was reached, which continued through 1979. During the latter period, brokers were not always able to purchase and re-sell all the coal their suppliers wished, and as a result some mining companies and a number of brokers went bankrupt. Although spot coal prices nationally peaked in November, 1974, and began a more gradual decline, they fluctuated in 1975 through 1977 at between $ 19 to $ 26, a much higher level than 1973 and prior years. Several reasons for the sustained high prices relative to prior years include a continuing rise of oil prices after the embargo ended, new air quality regulations creating increased demand for low sulfur coal, and continuing export demand for metallurgical coal. Spot prices, particularly for steam coal, peaked somewhat earlier than contract prices. Spot prices for metallurgical and export coal reached considerably higher peaks and declined somewhat more slowly than spot prices of steam coal sold to utilities. The Company bought and sold coal during its fiscal year 1975 below peak market prices to avoid price gouging and thus keep the loyalty of its buyers. Prices of coal mined in Appalachia were consistently higher than the national averages. *709 Average yearly spot prices FOB the mine for coal (steam and metallurgical) mined in Pennsylvania and West Virginia were as follows: Year
Pennsylvania
West Virginia
1972
$ 8.06
$ 10.12
1973
8.71
11.13
1974
17.85
20.77
1975
20.66
28.04
1976
20.27
28.48
1977
22.66
29.18
1978
22.41
31.12
The average purchase prices (FOB the mine) of coal purchased by the Company during fiscal years ending March 31, 1973, through March 31, 1979, were as follows: Year
Amount
1973
$ 8.57
1974
14.03
1975
31.60
1976
22.03
1977
19.88
1978
22.83
1979
27.07
The mines from which the Company purchased coal produced from 3,000 to 20,000 tons par month. The small mining companies the Company purchased from were dependent on brokers to dispose of their coal, and this was true during the high demand years From the Company's incorporation, its tonnage sold, average price per ton sold, sales, gross profit, gross profit per ton, gross profit as a percentage of sales and net profit per tax return have been as follows: Average
Tonnage
Price
Fiscal Year
Sold
Per Ton
1953
n1
n1
1954
n1
n1
1955
170,600
$ 3.92
1956
290,000
4.43
1957
237,000
4.92
1958
224,000
4.77
1959
305,000
4.52
1960
260,700
4.52
1961
378,400
4.34
1962
500,800
4.38
1963
423,400
4.23
1964
434,000
4.18
1965
468,200
4.10
1966
601,000
4.27
1967
727,000
4.65
1968
651,600
4.82
1969
966,800
5.29
1970
n1
n1
1971
1,545,000
9.25
1972
1,071,200
9.72
1973
934,600
9.88
1974
1,289,000
16.26
1975
1,220,000
37.96
1976
1,019,200
25.75
1977
1,467,500
22.92
1978
962,500
26.69
1979
1,242,000
30.56
*710 Gross
Gross Profit
Gross Profit
Net Profit
Fiscal
Year
Sales
Profit
Per Ton
as % of Sales
Per Return
1953
$ 106,500
$ 5,400
n1
5.07
$ (3,800)
1954
n1
n1
n1
n1
n1
1955
669,000
33,300
$ 0.20
4.98
8,900
1956
1,286,000
67,800
0.23
5.27
17,000
1957
1,165,000
53,600
0.23
4.60
3,500
1958
1,069,400
41,200
0.18
3.85
(2,900)
1959
1,380,000
57,000
0.19
4.13
900
1960
1,179,200
46,100
0.18
3.91
(14,600)
1961
1,641,200
76,100
0.20
4.64
(100)
1962
2,191,800
110,300
0.22
5.03
5,000
1963
1,790,900
99,300
0.23
5.54
5,700
1964
1,813,000
93,600
0.22
5.16
1,700
1965
1,919,900
100,650
0.22
5.24
2,600
1966
2,568,000
120,400
0.20
4.69
7,300
1967
3,378,100
143,600
0.20
4.25
6,300
1968
3,143,100
[1]
[1]
[1]
4,000
1969
5,111,200
[1]
[1]
[1]
7,500
1970
Short Year Fiscal Year End Changed from
n18/31 to 3/31 1971
14,294,000
1,251,800
0.81
8.76
915,100
1972
10,408,000
1,080,800
1.01
10.38
420,200
1973
9,233,600
1,219,500
1.31
13.21
102,100
1974
20,958,000
2,875,500
2.23
13.72
235,700
1975
46,305,300
7,756,400
6.36
16.75
660,700
1976
26,247,900
3,788,700
3.72
14.43
291,100
1977
33,628,800
4,462,300
3.04
13.27
359,000
1978
25,685,400
3,711,400
3.86
14.45
288,800
1979
37,953,400
4,333,900
3.49
11.42
316,800
*711 From 1953 through March 31, 1979, the Company's net profits and amounts paid as compensation to officer-shareholders were as follows: Taxable
Salaries and Bonuses
Year
Salaries and Bonuses
Net Profit After
Total
as a
Ending
to Foos Family
Compensation Paid
Net Profit
Percentage of Total
1953
None
$ (3,800)
$ (3,800)
1954
Unavailable
1955
$ 10,300
8,900
19,200
54%
1956
20,400
17,000
37,400
55%
1957
18,300
3,500
21,800
84%
1958
21,200
(2,900)
18,300
116%
1959
23,300
900
24,200
96%
1960
27,600
(14,600)
13,000
212%
1961
30,500
(100)
30,400
100%
1962
35,400
5,000
40,400
88%
1963
39,300
5,700
45,000
87%
1964
38,900
1,700
40,600
96%
1965
43,800
2,600
46,400
94%
1966
55,300
7,300
62,600
88%
1967
73,800
6,300
80,100
92%
1968
83,700
4,000
87,700
95%
1969
154,000
7,500
161,500
95%
1970
Short year - fiscal year-end changed from 8/31 to 3/31
1971
168,000
915,100
1,083,100
16%
1972
478,000
420,200
898,200
53%
1973
973,700
102,100
1,075,800
91%
1974
2,257,400
235,700
2,493,100
91%
1975
6,360,000
660,700
7,020,700
91%
1976
2,872,000
291,100
3,163,100
91%
1977
3,577,700
359,000
3,936,700
91%
1978
2,708,000
288,300
2,996,800
90%
1979
3,107,500
316,800
3,424,300
91%
*712 The total amounts paid Courtney and Mrs. Foos during the taxable years in issue (petitioners' calendar years 1974 through 1976) were paid pursuant to a formula adopted by the Company's Board of Directors at its February 13, 1973, meeting, which resolution provided, in pertinent part, as follows: In recognition of the fact that the profits of the business of this corporation are basically attributable to the personal services of [Courtney] and [Mrs. Foos], it is RESOLVED that their salaries and compensation of all forms, including bonuses, in the aggregate for the fiscal year ended March 31, 1973, shall be no less than ninety percent (90%) of the net corporate profits, leaving ten percent (10%) of the net corporate profits for corporate retention. On December 8, 1973, the Company's Board of Directors adopted a resolution that the February 13, 1973, resolution would continue to apply for its then fiscal year and would remain in full force and effect in subsequent years until modified or revoked. For its fiscal years ended March 31, 1974, March 31, 1975, and March 31, 1976, the Company paid Courtney and Mrs. Foos the following amounts which the Company treated as compensation, *713 including salary and bonuses: Fiscal Year Ended
Courtney
Mrs. Foos
1974
$ 1,128,700
$ 1,128,700
1975
3,180,000
3,180,000
1976
1,484,100
1,388,000
These amounts were paid in the form of salary and bonus, and were treated as compensation by the Company for all purposes and deducted by the Company as compensation on its tax returns for each relevant period. The greater part of the compensation represented year end bonuses. Courtney and Mrs. Foos treated such amounts as compensation on their individual tax returns (Forms 1040) for calendar years 1973, 1974, 1975 and 1976. During the years in issue the Company did not have a pension or profit sharing plan. Respondent in his statutory notices of deficiencies determined reasonable compensation for the Fooses to be: Fiscal Year Ended
Courtney
Mrs. Foos
1974
$ 289,190
$ 289,190
1975
318,109
318,109
1976
349,919
349,919
Courtney's salary started out at $ 3,245 in 1958 and increased to $ 6,780 in 1959, $ 8,049 in 1960, $ 11,757 in 1961, $ 15,800 in 1962, and successively higher amounts in subsequent years. The balance of compensation paid during those years was to Mrs. Foos. *714 She gradually increased his salary as his experience increased and he proved himself. On or about March 12, 1970, Mrs. Foos transferred to Courtney sufficient shares so that each of them would own fifty percent (50%) of the Company's issued and outstanding stock. Since 1970, with the exception of fiscal year ended March 31, 1976, when Courtney received $ 1,484,000 and Mrs. Foos received $ 1,388,000, the amounts of salary and bonus paid to Courtney and Mrs. Foos have been equal. The amounts paid Courtney and Mrs. Foos as salary and bonus subsequent to the periods in issue have been at the following levels: Company's Taxable
Year Ending
March 31
Courtney
Mrs. Foos
1977
$ 1,788,850
$ 1,788,850
1978
1,354,000
1,354,000
1979
1,553,750
1,553,750
The Company, a Subchapter S corporation, distributed to its shareholders, in forms other than compensation, including dividends, previously undistributed taxable income (PUTI), and credited its shareholders with undistributed taxable income (UTI) the following amounts during its fiscal years: Distributed
Fiscal Year
Dividends and
Credited
Ended March 31
P.U.T.I.
U.T.I.
1974
$ 196,000
$ 286,198
1975
143,574
1,331,169
1976
785,585
357,165
1977
178,632
370,590
1978
255,000
302,032
1979
335,000
349,959
*715 The Company's capital accounts during the relevant periods were as follows: Capital
Paid-In
Retained
Total
Stock
Capital
Earnings
Capital
March 31, 1973
$ 13,800
0
$ 137,700
$ 151,500
March 31, 1974
13,800
0
171,900
185,700
March 31, 1975
13,800
0
689,000
702,800
March 31, 1976
13,800
0
194,500
208,300
Mr. Gerald D. Sherman, the Company's accountant, expressed his opinion that Courtney and Mrs. Foos would be able to obtain from an unrelated employer or investor a compensation package based upon the current 90 percent of corporate net profits formula. He also expressed the opinion that, without Courtney and Mrs. Foos, the Company's stock would be worth no more than the discounted cash value of its net worth. Since the Company does not inventory coal he determined its net worth to be the cash, the excess of its receivables over payables, plus a small amount for furniture and fixtures. Mr. Sherman had no coal brokers, other than the Company, as clients, had no personal knowledge of compensation paid by other coal brokerage firms, was not aware of any offers to Courtney or Mrs. Foos by other firms, and had not attempted to contact *716 any other coal brokers to find out what they paid their officers or employees. He is a certified public accountant with twelve years experience in advising the Company. He has published in areas dealing with compensation and he has lectured to numerous tax institutions. During his career he has been engaged frequently in the acquisition, sale and valuation of businesses. He has participated in negotiations for acquisitions in the fields of real estate brokerage, insurance brokerage, real properties, hotels, food processing, linen supply, nursing homes, utility companies, land development companies, building supply companies, race tracks, and sport franchises. In addition, he has encountered and advised regarding valuation issues in both the gift tax and estate planning fields. Petitioner's second expert witness was Mr. Joel Price, First Vice President of Research for Dean Witter Reynolds, Inc., a large stock brokerage firm. Mr. Price specializes in the coal industry and prepares The Coal Observer, one of the largest selling coal publications in the world today.He has given numerous speeches at industrial seminars, universities, public television and has testified before *717 Congressional committees on energy. He also belongs to several professional societies. In the period from fiscal year ended March 31, 1974 through fiscal year ended March 31, 1979, the coal industry changed drastically. The first half could be described as a period of excess demand, when prices were driven sharply upward. During this period the Company choose not to price gouge, or engage in sharp or unfair business practices. The Company made substantial profits but less than it would have had it decided to sell at peak prices or cheated its customers. Mr. Price stated that "it was virtually impossible not to increase your profit margin at that time".The second half was a period of over supply. Many mine operators and coal brokers went bankrupt for want of sufficient sales.During this depressed period the Company was able to maintain significant profitability because it had diversified in types of coal handled, types of customers, and rail carriers, and because many of the Company's customers stayed loyal to the Company. Although the compensation paid to each petitioner exceeded that of many top chief executive officers of America's largest corporations, it was Mr. Price's *718 opinion that it was justifiable given the Company's record of profitability in the industry. He has, however, never done a study of privately held coal brokers firms. He did not have access to any financial records of any other coal brokerage firm. He based his opinion on other types of companies in the coal industry, including those who employ agents to buy and sell coal. He also stated that generally coal brokers work on an agency basis for mines and are paid on a percentage commission.The Company, by contrast, trades as a principal for its own account. He indicated that there were 400 to 500 coal brokers in the eastern part of the United States, but he did not know how many were agent brokers as opposed to principal brokers. Petitioner's third expert witness was Edmund A. Schwesinger, Jr., a principal of A.S. Hansen, Inc. (Hansen), a consulting firm that specializes in designing compensation, actuarial and other reward plans, including all areas of compensation: base salary, incentive bonus, capital accumulation, employee benefits in case of illness, death, disability or retirement, and executive perquisites.Prior to joining the Hansen firm, he worked for the General Motors *719 Corporation in its Executive Compensation Group and for the accounting firm of Peat, Marwick, Mitchell and Company in both its New York and Los Angeles executive compensation practice. He has published articles on compensation and lectured at seminars sponsored by the National Association of Accountants, the Financial Executives Institute, the University of California at Los Angeles, and the International Foundation of Employee Benefit Plans. Mr. Schwesinger and his associates prepared a study at the Hansen company regarding the amounts paid to Courtney and Mrs. Foos. In conducting the study, they employed methods generally recognized by professionals in the compensation field. Their approach consisted of five steps. The first step was to understand the Company and its business. To accomplish this they attempted to gather information from public and private sources. They culled coal related articles from various publications. They met with a security analyst from the Dean Witter stock brokerage firm who specialized in the coal industry and with an executive of the Merrill, Lynch, Pierce, Fenner & Smith stock brokerage firm about his knowledge of the coal industry and its *720 commission structure. They looked at the Company's financial statements and talked with the Fooses about the Company's organization, its decision making arrangements and operations. Their second step was to evaluate the cash compensation levels (base compensation plus incentive bonus) of the coal industry in general and the Fooses in particular.In this they were less successful. Privately owned coal brokerage and mining companies refused to discuss their compensation practices. Mr. Schwesinger was unable to obtain responses to telephone and written inquiries to numerous privately held coal brokerage companies, and was forced to use published data from publicly held brokerage corporations. He sought brokerage firms which were roughly similar to the Company in size and volume of business. He did not find any coal brokers or companies in which services were a greater income producing factor than capital. He and his associates selected the following ten broker/dealer firms for comparison: The Boston Co., Inc., Inter-Regional Financial Group, Inc., The J.P. Cabot Equity Corp., The Zeigler Co., Inc., A.G. Edwards & Sons, Inc., Philips, Appel & Walden, Inc., Donaldson, Lufkin & *721 Jenrette Co., Piper Jaffray, Inc., Shearson, Hayden, Stone, Inc., Weeden Holding Corporation These firms are securities or commodities brokers which derived most of their income by acting as agents for their clients for a percentage commission. None are brokers who deal exclusively or primarily on their own accounts in a single commodity such as coal. Portions of the business profits of several of these firms came from other areas such as equipment leasing, real property management and development, and asset management services. In selecting his group of 10 securities broker/dealers for comparison, Mr. Schwesinger included only those companies he deterined were equivalent in size in terms of average commission income. He rejected any firms which he determined were much too large. Average revenues of the ten broker/dealers ranged from $ 27,260,189 in 1972 to $ 57,781,481 in 1976. Average commission income of the group ranged from $ 17,577,360 in 1972 to $ 33,325,706 in 1976. These figures do not include the cost of securities bought and sold. Gross profits of the Company (after eliminating the cost of coal sold) ranged from $ 1,080,800 in fiscal year ended March 31, 1972, to *722 $ 3,788,700 in fiscal year ended March 31, 1976, with a high year of $ 7,756,400 in fiscal year ended March 31, 1975. Several of the broker/dealer companies in the group used by Mr. Schwesinger were large, such as Shearson, Hayden, Stone, Inc., a retail securities firm belonging to the New York Exchange with 3,800 employees, including 1,600 investment executives, and $ 120,687,758 of commission income in 1976. Some had commission income approximately equal to or less than the Company; for example, for the fiscal year ended August 31, 1973, the J.P. Cabot Equity Corp., a broker of securities and commodities which employed approximately 200 people, had commission income of $ 4,716,741, and Philips, Appel & Walden, Inc., which also employed approximately 200 people, had revenues of $ 4,440,208. The third step was to compare the value of the Fooses' compensation arrangement to those corporations which provide accumulation programs. Frequently business executives get significant amounts beyond their base pay and bonus in capital appreciation opportunities, such as stock option, restricted stock, phantom stock and other types of plans prevalent in American industry.The Company had *723 no capital appreciation program. The fourth step was to compare the value of the Fooses' compensation arrangement to those corporations which provide various types of employee health and benefit programs such as pension, profit-sharing, medical, and disability plans. The Company has no health or benefit plans. The fifth step was to compare the value of the Fooses' compensation arrangement to those corporations which provide perquisites for their executives, such as company cars, company airplanes, company-sponsored educational events, and other executive fringe benefits. The Company offered no such perquisites. The Hansen study concluded that the compensation paid to Courtney and Mrs. Foos was appropriate based on the five step approach employed in the analysis. There are a number of reasons supporting Mr. Schwesinger's conclusion, some of which are as follows: The Company quided by the Fooses "outperformed" the stock brokerage industry. The Hansen study compared the return on capital of the Company with all New York Stock Exchange members and the ten company selected sample: Return on Equity After Corporate Taxes
[1] Foos
All N.Y.S.E.
10 Company
Year
Coal Co.
Members
Sample
1973
128.0%
(3.0)%
6.25%
1974
174.0
0.7
(2.80)
1975
88.0
16.6
15.43
1976
150.0
17.6
16.43
1977
115.0
6.9
[2]
1978
167.0
10.9
[2]
Average
137.0%
8.2%
8.8%
*724 In absolute figures, the Company was very profitable during the boom years of the coal industry and was able to maintain significant profitability during the depressed period. The Company has never had exclusie contracts with mines from which it bought and thus during the period of high demand it had many competitors. Entry into the business was sufficiently easy that there were between 400 to 500 coal brokers (agents and principals) in the eastern United States during the relevant period. This was because to be a coal broker does not require large amounts of invested capital, nor does it require maintaining large capital accounts. There are no barriers to entry because of size, unlike other businesses where successful operation may be achieved only after certain economies of the scale in plant, production or sales have been reached. Nor are there any technological, patent or copyright obstacles. Yet, despite fierce competition, the Company was able to achieve record profits. When the Appalachian coal industry was in a decline, a great number of mines went out of business. During this period when *725 many coal brokers were experiencing great difficulty, Courtney and Mrs. Foos were able to maintain their personnel and costs at a minimum, and this, coupled with aggressive and shrewd trading, created large profits for the Company. In the stock brokerage industry it is not uncommon for some brokers who have no mangerial, accounting or routing responsibilities to earn in the relevant period over $ 1 million per year in direct compensation (base salary and bonuses), not counting capital appreciation opportunities, pension plans or executive perquisites. The study found that the Company's profits were the result of Courtney's and Mrs. Foos's knowledge, experience, efforts, astute trading and business acumen. The Company's large profits were not generated by inventory gains because there was no inventory. There were no employment contracts, so the Company could not reap the excess profits from the income a successful employee generated over that employee's contractually limited salary. Thus, Hansen reported that the compensation plan installed by the Company to reward the two executives recognized their performance and contributions and rewarded them appropriately. The report stated *726 that the absence of a capital accumulation program, pension or profit sharing plan, employee health as benefit program and executive perquisites was properly made up in direct cash compensation through base salary and bonuses. The Company generally pays the mines on the 25th of the month following shipment after receving payment from the customers on the 20th of the month.The Company has borrowed sums of money to provide liquidity for those instances where it must pay its supplier before it has received the sales proceeds from its customer. This has happened, for example, when Mrs. Foos fell several months behind in her invoicing because of an increased workload or when a mine demanded payment earlier than is the custom in the trade. During fiscal years ended March 31, 1973, 1974, and 1975, the Company borrowed substantial amounts from the Continental Bank in Philadelphia on a short-term basis. The amounts of such loans outstanding as of the end of each fiscal year were as follows: March 31, 1973
$ 162,666.37
March 31, 1974
1,704,348.21
March 31, 1975
280,140.05
The minutes of the meeting of May 8, 1975, held by the Company's Board of Directors states *727 the following reason for the above borrowing: The President reported that the corporation has borrowed significant sums of money in past years from Continental Bank, Philadelphia, Pennsylvania, on a short-term basis in order to pay promptly for coal purchases before receiving payment of the corporation's Accounts Receivable. Prompt payment to the mines was necessary in order for the corporation to obtain the necessary coal tonnage to supply its customers. All bank loans were paid off prior to March 31, 1976. The Company has not borrowed from any third party source, other than Mrs. Foos, since March 31, 1975. During the fiscal year ended March 31, 1975, the Company borrowed the following amounts from Mrs. Foos: Date
Principal
Interest
Maturity
of Loan
Amount
Rate
Date
June 19, 1974
$ 145,000
8%
March 31, 1977
August 17, 1974
52,000
8
March 31, 1977
August 31, 1974
17,000
8
March 31, 1977
These loans were still outstanding as of March 31, 1975. On April 15, 1975, the Company officers decided it was necessary to borrow an additional $ 100,000 from Mrs. Foos. This loan was consolidated with the previously outstanding loans, and a new *728 note was issued to Mrs. Foos on May 8, 1975, in the face amount of $ 467,000, bearing interest at the annual rate of 6 percent and with a maturity date date of March 31, 1977. On June 14, 1975, the Company's directors borrowed an additional $ 383,000 from Mrs. Foos at 6 percent until December 14, 1975, for the reasons stated in the minutes of the May 8, 1975, meeting, quoted above. On December 14, 1975, "due to the cash flow position of the corporation," the corporate officers requested and Mrs. Foos consented to an extension of time to pay the June 14, 1975, note to June 14, 1976.On February 18, 1976, "due to the continued cash flow problem of the corporation," the Company borrowed an additional $ 177,000 from Mrs. Foos, repayable on October 31, 1976. As of March 31, 1976, the Company's loans from Mrs. Foos totaled $ 1,027,000. On September 8, 1976, the Company borrowed an additional $ 507,000 from Mrs. Foos, repayable on September 8, 1977, at 6 percent interest, a loan which the Company officers determined was necessary for the Company. The advances were short-loans, unsubordinated to general creditors, and replaceable with bank financing, if desired, through hypothecation of *729 rated accounts receivable. In addition to borrowing money from its shareholders and the Continental Bank, the Company loaned money to its shareholders. The following schedule indicated the cash available, loans to shareholder, loans from Mrs. Foos, loans from the Continental Bank and the net assets or liabilities: ASSETS
As of Fiscal
Year Ended
(1) Cash
(2) Loans to
March 31
in Bank
Shareholders
1972
$ 278,000
0
1973
304,000
$ 125,000
1974
221,000
0
1975
1,595,000
0
1976
718,000
12,000
1977
948,000
2,043,000
1978
1,545,000
1,224,000
1979
700,000
1,570,000
LIABILITIES
As of Fiscal
(4) Loans from
(5) Net Assets
Year Ended
(3) Loans from
Continental
or
March 31
Mrs. Foos
Bank
Liabilities
1972
$ 12,000
0
$ 266,000
1973
0
$ 162,666.37
266,333.63
1974
0
1,704,348.21
(1,483,348.21)
1975
367,000
28,0140.05
947,859.95
1976
1,027,000
0
(297,000)
1977
1,374,000
0
1,617,000
1978
907,000
0
1,862,000
1979
1,642,000
0
628,000
Facts Relating To Issue 2.
In 1973 Courtney purchased a 200 acre farm in Phoenixville, Pennsylvania, on which he had built a track, a barn, *730 an equipment shed, and grooms' quarters, as well as approximately 20 fencedin breeding paddocks and four broodmare shelters. Construction was completed in January, 1974, at which time Courtney moved his residence and his office to the farm. During 1974 through 1976 Countney was engaged in racing and breeding horses as a sole proprietor, operating on and out of his Phoenixville farm. It is a quarter mile from the stables to the Company's office and Courtney's personal residence. During the relevant period his horse racing and breeding operation was a separate, independent operation run by trainers, grooms, veterinarians, and other experts. However, Courtney did contribute personal services to the operation by hiring and supervising the staff. He fired several trainers because they were not doing their jobs well. He also drove horses at the race tracks and participated in training the horses. During 1974 through 1976, Courtney had approximately 10 to 16 horses engaged in racing and training, as well as approxiately 10 broodmares and several foals and yearlings at any given time. Courtney raised and raced exclusively trotters and pacers. During the relevant period he usually *731 drove once or twice a week in the evening. It required three hours to travel to and from the track, confer with his trainer about the status of the business, and drive in the race. During 1974, 1975, and 1976 Courtney's horse racing operation earned approxiately $ 30,000 per year from purses for races Courtney drove, but overall losses were $ 517,633.51, $ 507,469.46 and $ 558,516.35, respectively. ULTIMATE FINDINGS OF FACT 1. The amounts paid by the Company to Courtney and Mrs. Foos during the fiscal years ended March 31, 1974, 1975 and 1976 which represented reasonable compensation for services rendered are as follows: Fiscal Year Ended
March 31
Courtney
Mrs. Foos
1974
$ 807,930
$ 807,930
1975
1,606,210
1,606,210
1976
1,044,930
948,930
2. A reasonable allowance for the personal services Courtney contributed to his horse racing and breeding proprietor-ship during each of the taxable years 1974, 1975 and 1976 is $ 15,000. OPINION Issue 1. Reasonable Compensation
The first question presented is whether amounts received by Mrs. Foos and Courtney from the Company during 1974, 1975 and 1976 represented reasonable compensation. Unlike *732 most reasonable compensation cases the issue here is not the deductibility of the payments by the corporation but rather the character of the income to the employee; that is, whether any part of the distribution represents dividends and not earned income. Because the Company is a Subschapter S corporation and petitioners are its only shareholders, all the Company's income would be reported by the Fooses either as salary or dividends under section 1373(b). This distinction between earned income and dividend income is not, however, academic. Section 1348 limits the tax imposed on earned taxable income within any one taxable year to a maximum rate of 50 percent. [2] The section 1348(b)(1) definition of earned income, for the years in issue, included income within the meaning of section 911(b). Section 911(b) defined earned income in the following manner: *733 (b) DEFINITION OF EARNED INCOME.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. * * * Thus, any portion of the distributions received by petitioners from the Company which is in excess of a reasonable compensation is not earned income. Accordingly, it is taxed as a distribution of corporate profits (i.e., dividends) and thus subject to a maximum tax rate of 70 percent instead of the 50 percent rate applicable to earned income. Compare sections 1(a) and 1348(a). Section 162(a)(1) provides that in computing its taxable income a corporation shall be allowed as a deduction all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a "reasonable allowance for salaries or other compensation for personal *734 services actually rendered." This Court has held that compensation which qualified as "a reasonable allowance… for personal services actually rendered" under section 162(a)(1) qualifies as earned income for purposes of section 1348; conversely, compensation which is unreasonable under section 162(a)(1) does not qualify. Kennedy v. Commissioner,72 T.C. 793, 805-806 (1979). Therefore, the case law defining "reasonable compensation" under section 162(a)(1) is controlling for purposes of this case. To come within the ambit of section 162(a)(1), compensation must be both reasonable in amount and in fact paid purely for services. Section 1.162-7(a), Income Tax Regs.; Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. without opinion, 496 F.2d 876 (5th Cir. 1974); Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd., 261 F.2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Both tests present questions of fact which must be resolved on the basis of all the facts and circumstances of each particular case. Charles Schneider & Co., Inc. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), *735 cert. denied 420 U.S. 908 (1975), affg. T.C. Memo. 1973-130; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975); Electric & Neon, Inc. v. Commissioner,supra;Boyle Fuel Co. v. Commissioner,53 T.C. 162, 169 (1969). Respondent's determination is presumed to be correct, and petitioners bear the burden of proving that the amounts of compensation allowed by respondent are unreasonably low. Botany Mills v. Commissioner,278 U.S. 282, 292 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure. If petitioners succeed in showing that respondent's determination was erroneous, the presumption loses its effect and the Court must determine what was reasonable compensation under the particular facts and circumstances presented herein. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,supra.The salary of each officer is to be judged separately in determining whether it is reasonable. L. Schepp Co. v. Commissioner,25 B.T.A. 419, 429-30 (1932). *736 The substantially greater part of the Fooses' compensation was paid in the form of a year end bonus. A bonus paid, either as a flat amount or as a percentage of earnings, to a shareholder employee of a corporation at the end of the year, in addition to a fixed salary, does not prevent the total amount paid by the corporation from being reasonable compensation for services. William S. Gray & Co. v. United States,68 Ct. Cl. 480, 35 F.2d 968 (1929). The size of the amount, even though large, or a material increase in the amount received in any one year over the preceeding years, does not in itself prevent the payment from being reasonable compensation. William S. Gray & Co. v. United States,supra.However, compensation paid to employee-stockholders by closely held corporations are subject to careful scrutiny in order that what is really a distribution of dividends may not be passed off as payment of compensation. Ecco High Frequency Corp v. Commissioner,167 F.2d 583 (2d Cir. 1948), cert. denied 335 U.S. 825 (1948); Logan Lumber Co. v. Commissioner,365 F.2d 846, 851 (5th Cir. 1966); Miles-Conley Co. v. Commissioner,173 F.2d 958, 960 (4th Cir. 1949) *737 affg. 10 T.C. 754 (1948). Courts have examined the following factors, among others, in determining whether compensation is reasonable: 1. Employee's qualifications and training. 2. Nature, extent, and scope of his duties. 3. Responsibilities and hours involved. 4. Size and complexity of the business. 5. Results of the employee's efforts. 6.Prevailing rates for comparable employees in comparable business. (See section 1.162-7(b)(3), Income Tax Regs.) 7. Scarcity of other qualified employees. 8. Ratio of compensation to gross and net income (before salaries and Federal income tax) of the business. 9. Salary policy of the employer to its other employees. 10. Amount of compensation paid to the employee in prior years. 11. Employee's responsibility for employer's inception and/or success. 12. Time of year the compensation was determined.
13. Whether compensation was set by corporate directors. 14. Correlation between the stockholder-employees' compensation and his stockholdings. 15. Corporate dividend history. 16. Contingent compensation formulas agreed on prior to the rendition of services and based upon a free *738 bargain between the employer and employee. (See section 1.162-7(b)(2), Income Tax Regs.) 17. Under-compensation in prior years. 18. Compensation paid in accordance with a plan which has been consistently followed. 19. Prevailing economic conditions. 20. Whether payments were meant as an inducement to remain with the employer. 21. Examination of the financial condition of the company after payment of compensation. See Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), Irby Construction Company v. United States,290 F.2d 824 (Ct. Cl. 1961). The Company is a coal broker. It buys and sells coal on its own account, seeking its profit on the spread between the price it must pay the mines for the coal and the price it receives from its customers. It has paid, pursuant to a formula adopted by its board of directors, 90 percent of its net corporate profits to the Fooses "in recognition of the fact that the profits of the business of this corporation are basically attributable to the personal services of (Courtney) and (Mrs. Foos)." This amounted to $ 1,182,700, $ 3,180,000 and $ 1,484,000 bing paid to Courtney and $ *739 1,182,700, $ 3,180,000 and $ 1,388,000 being paid to Mrs. Foos for the Company's fiscal years 1974, 1975 and 1976, respectively. Petitioners argue that the Company was essentially a personal service business and hence the best measure of reasonable compensation of key executives is the net profit of the business. In support of his argument, petitioners rely on cases where the compensation held to be reasonable was a very high percentage of the business' net profits. See, e.g., LaMastro v. Commissioner,72 T.C. 377 (1979); and Edurado Catalano, Inc. v. Commissioner,T.C. Memo. 1979-183. Petitioners contend that the Company should be treated as if it were a professional service business because (1) the Fooses are totally responsible for obtaining and executing the Company's purchase and sales orders; (2) capital is not a significant income producing factor; (3) the Company enters into separate contracts with its buyers and sellers only to preclude the possibility of direct dealing between the buyers and sellers; (4) the Company has no liability for failure to deliver on an order under the customs of the trade; (5) the Company takes title to the *740 coal only fleetingly, it does not inventory any coal, it does not buy coal until it has a sales order, and it does not speculate in the purchase and sale of coal; (6) the Company has no goodwill other than the Fooses' personal relationships and contacts; and (7) the Fooses have undergone a lengthy and intensive training period for their business much like the preparation for a profession. We find the Company was not a personal service. In the cited cases the corporations were organized as professional service corporations under the applicable state corporation laws, and the income of each corporation consisted exclusively of fees generated by professional services rendered exclusively or primarily by its sole shareholder. Thus, the cited cases are distinguishable from the present case in two respects. The Company is not, nor could it be organized as a professional service corporation in Pennsylvania. 15 Pa. Stat. Ann. §§ 2901 et. seq. And the Company is not providing the services of Courtney and Mrs. Foos for a fee-it is buying and selling coal for a profit. Petro-Chem Marketing Co. v. United States,602 F.2d 959, 962 (Ct. Cl. 1979). *741 Regarding petitioners' other reasons, we are not persuaded the Company is sufficiently like a professional service corporation to be treated as if it were one. The fact that the Fooses are totally responsible for obtaining and executing the Company's purchase and sales orders establishes only that the Fooses render services to the Company but it does not mean the Company renders a service to its customers. Although capital is not as important in coal brokerage as it is, for example, in automobile manufacturing, it is hardly irrelevant. [3] The Company borrowed significant amounts from its bank and Mrs. Foos, and the corporate minutes reveal a need for capital to maintain a cash flow necessary for the continued operation of the business. Thus, we think that the Company necessarily requires, and in fact uses, capital for the conduct of its business.If the nature of the business is such that it cannot be carried on at all without the use of capital (invested or borrowed) and such use of capital plays a necessary part in the successful conduct of the business, it cannot be said that its use in the business is merely incidental.Cf. Hubbard-Ragsdale Co. v. Dean,15 F.2d 410 *742 (S.D.Ohio, 1926), affd. 15 F.2d 1013 (6th Cir. 1926). That the Company enters into separate contracts with its buyers and sellers only to preclude their dealing directly does not make it any less a principal in its business transactions. We are not persuaded that the Company is a strawman, a conduit or an agent for either the coal producers or its customers. The evidence indicates otherwise. The Company makes its profit on its own account by buying low and selling high. It was not like a sales agent working on a fixed commission for a mining company or a purchasing agent working on a salary for a utility company.See Petro-Chem Marketing Co. v. United States,602 F.2d 959 (Ct. Cl. 1979). The absence of the Company's liability to a buyer when a mine, for example, mistakenly ships non-conforming coal does not transform the Company into a personal service business. Moreover, the Company would still be liable if Courtney or Mrs. Foos made an error in, for example, the freight rates or misapplication of coal. Nor does the Fooses' ability to lessen any financial liability of a mine by locating alternate buyers for the coal transform an essentially principal *743 role into an agency role. The Company still makes its profits on the sale of coal; the only difference is that it has renegotiated the original purchase price and has sold the coal to a second buyer. Trading on one's own account is essentially a mercantile business, not a personal service. Hubbard-Ragsdale Co. v. Dean,supra.Petro-Chem Marketing Co. v. United States,supra.Although the Company takes title to the coal only temporarily, does not inventory coal, does not buy coal until it has a sales order, and does not speculate, these factors do not persuade us that the Company's coal brokering is akin to a professional service corporation. Likewise, petitioners' contentions that the Company has no goodwill other than the Fooses' personal relationships and reputations and that the Fooses, like many professionals, have undergone a lengthy and intensive training period for their business are not persuasive. *744 Although we think the data bank maintained by the Fooses has a definite value (the evidence suggests the Fooses ascribe grave concern to customer lists and other trade secret information), even assuming the importance of the Fooses' personal relationships and contacts, this is not sufficient to transcend the inherently mercantile character of the Company's business. Nor does the fact that it took the Fooses many years of assidous work to become the accomplished traders and shrewd dealers they are today. It may have taken the Fooses longer to become proficient in their business than it takes a lawyer, doctor, architect or dentist to advance in his or her profession. But, contrary to petitioners' premises, there is a great difference between rendering legal advice, a medical opinion, a set of architectural plans or a capped tooth and rendering 100 box cars of coal.
Petitioners' next argument that their compensation should be treated as earned income is that their compensation is analogous to commissions and respondent's regulations defining earned income specifically include commissions on sales. We disagree. Section 1.1348-3(a)(1)(i), Income Tax Regs. provides, in part: *745 (a) Earned income--(1) In general. (i) For purposes of section 1348 and the regulations thereunder, the term "earned income" means any item of gross income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b) unless the item constitutes deferred compensation * * * or is otherwise excluded by application of this paragraph. Thus, subject to such exceptions, the term includes-- (A) Wages, salaries, professional fees, bonuses, * * * commissions on sales * * * received actually or constructively, as compensation for personal services actually rendered regardless of the medium or basis of payment. The term does not include such income as dividends (including an amount treated as a dividend by reason of section 1373(b) and § 1.1373-1) * * *. Petitioners have misinterpreted this regulation in three ways.First, we think the words "commissions on sales" refer to amounts paid to an agent, for example, a sales agent who sells commodities or assists in the sale of other property on behalf of a principal for a percentage of the sales price. By contrast, the Company does not negotiate a commission rate with the mines; it negotiates the price of *746 coal. The amount of money the Company makes on a transaction depends on the spread between what a purchaser (unknown to the mine) will pay and a mine (unknown to the purchaser) will accept. Thus the Company's income represents the profit on purchases and sales rather than a commission from a mine for the service of finding a supplier.Second, the above-quoted regulation, which defines earned income to include commissions on sales, excludes from that definition dividends, including amounts treated as dividends under section 1373(b), relating to Subchapter S Corporations such as the Company. Third, the fact that the mine operators and coal consumers look to the Fooses as the persons responsible for their coal being bought and sold, does not warrant the conclusion that the Company is a personal service business. There is a distinction between the services employees render to an employer and the character of the employer's business. Thus, we think the compensation paid to the Fooses was not commissions on sales. Petitioners' third argument that their own compensation was reasonable is based on the salary levels and dividends paid by other businesses. No busineses comparable to the *747 Company, however, were available for a comparision. Nevertheless, petitioners contend the Hansen study, which surveyed other corporations bearing some similarities to the Company and adduced some evidence regarding stock brokerage commission compensation and financial performance levels, is relevant in determining the reasonableness of their own compensation. They further contend that since the Company paid shareholders a higher rate of return on equity than various stock brokerage firms, the compensation paid to them was residual in amount and was necessarily reasonable. Respondent argues that the Hansen study does not properly compare the compensation paid the Fooses with that received by individuals serving in the same capacity with similar companies, and should therefore be disregarded. The use of comparison evidence in determining the reasonableness of compensation is authorized in section 1.162-7(b)(3), Income Tax Regs., which states, in part: [T]he allowance for compensation paid may not exceed what is reasonable under all the circumstances.It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for *748 like services by like enterprises under like circumstances. While this type of evidence is relevant in considering the reasonableness of compensation in a given case, such an inquiry is only proper where there exists a comparable job entailing comparable services. Giles Industries, Inc. v. United States,496 F.2d 556, 563 (Ct. Cl. 1974). Although Mr. Price, Mr. Schwesinger and Courtney testified that there are no coal brokerage businesses comparable to the Company, that the Fooses are unique individuals, and that their business methods and operations are unique, we are not convinced that there is no other firm among the 400 to 500 coal brokers in the East that is similar to the Company. Mr. Price, although an expert in the coal industry in general, was not as familar with coal brokering. Mr. Schwesinger was even less familar with coal brokering. Courtney, at one point, testified regarding his competitors "[I] never really apid much attention to what's going on around me." However, we think, as a matter of practical research, no comparable coal brokerage firm was reasonably available for in depth comparisons. Unable to locate true comparables, Mr. Schwesinger *749 nevertheless made various comparisons between the Company and a sample of ten selected publicly traded companies. These firms were primarily engaged in the security and commodity brokerage business, deriving most of their income by acting as agents for their clients for a percentage commission. None are brokers who deal exclusively or primarily on their own accounts in a single commodity such as coal. The firms were more capital intensive and larger than the Company in terms of number of employees and gross revenues. Considerable evidence was presented by petitioners concerning compensation paid to officers of the ten company sample. Much of it cannot be accepted as relevant to the reasonableness of the Fooses' compensation because with respect to some of the selected corporations, incomparability is clearly shown, both with respect to the nature of their operations and the services performed, and because with respect to other corporations there is either insufficient or no proof as to similarity of operations and services performed. Giles Industries, Inc. v. United States,496 F.2d at 564. Nevertheless, some financial information can be relevant although the *750 weight given to it will correspond to the degree of comparability shown. Giles Industries, Inc. v. United States,496 F.2d at 567.Althouth the Hansen study provided some useful information regarding the coal business, we have accorded little weight to the compensation levels described.Respondent had no expert witnesses regarding compensation levels. Petitioners point out that the Company's average rate of return on equity for the period 1973 through 1978 was 137 percent and this was so significantly higher than the rate of 8.8 percent for the ten company selected sample and 8.2 percent for all companies traded on the New York Stock Exchange that the compensation paid to the Fooses was residual in amount and therefore had to be reasonable. While such comparisons are relevant, Gordy Tire Co. v. United States,296 F.2d 476 (Ct. Cl. 1961), they are but one factor to be weighed. Mayson Mfg. Co. v. Commissioner,178 F.2d 115 (6th Cir. 1949). Moreover, becase the Company has chosen to manage its finances using a high proportion of borrowed capital, this would tend to make the return on invested capital higher than it would otherwise *751 be. Petitioners are paid 90 percent of the net corporate profit pursuant to a resolution originally passed by the Company's board of directors on February 13, 1973. Respondent contends that the timing of the resolution adoipting the bonus formula indicates a tax avoidance motive because the resolution was not passed until after the maximum tax rate on earned income took effect. The timing of the decision as to the amount of the bonus can be suggestive of its purpose. Bonuses determined at year end can be indicative of a corporation's attempt to use up in the form of purported extra compensation those profits already determined and otherwise available for distribution as dividends. Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968) affg. T.C. Memo. 1967-7; Boyle Fuel Co. v. Commissioner,53 T.C. 162 (1969); Petro-Chem Marketing Co. Inc. v. United States,602 F.2d 959 (Ct. Cl. 1979). This does not appear to be the situation in this case where the Company's board of directors passed a resolution creating the 90 percent of net corporate profits formula at least thirteen months before the fiscal years *752 at issue. Respondent, however, bases his argument of tax avoidance not on the timing of the determination of the dollar amount of the bonus, but on the timing of the corporate resolution creating the continuing formula.We think the facts here do not clearly support such a contention. The corporate resolution was originally passed on February 13, 1973 for its fiscal year ended March 31, 1973 (which began on April 1, 1972). Section 1348 which imposed a maximum tax on earned income was enacted by section 804 of the Tax Reform Act of 1969, P.L. 91-172, 83 Stat. 487, and first applied to taxable years beginning after December 31, 1970. The resolution could not be called an immediate response to attempt to come within new protective legislation. Moreover, for the five year period prior to the enactment of section 1348 (1964-1969), the Company paid on the average of over 90 percent of its total net income to the Fooses. Thus, we give little weight to this argment of respondent. Although we refer specifically only to those factors on which we placed our greatest reliance, we have considered all relevant criteria in reaching our decision. Based on a thorough review of the record, *753 we find petitioners have satisfied their burden of showing that respondent's determination of reasonable compensation was too low. While a reasonable salary cannot be determined with mathematical precision, Clinton Co. v. Commissioner,159 F.2d 102, 104 (7th Cir. 1946), we think the compensation determined in our ultimate findings of fact is reasonable under the particular facts and circumstances of this case. We think the petitioners are highly qualified coal dealers. Their business acumen is aptly demonstrated by the Company's substantial gross profits despite many competitors and periodically adverse business cycles. They have full and total responsibility for all the Company's complex operations, while their staff is small and primarily clerical. They have assidously applied themselves to their labors working extremely long hours seven days a week for many years. Although the Company has few employees, the volume of business is substantial and the success of the Company is due in great part to the efforts of the Fooses. However, to some extent the Company profits do represent the fortuitous benefits of a chaotic coal market which saw prices and profit *754 margins driven to historically high levels by an excess of demand coupled with an inflationary spiral. See Petro-Chem Marketing Co., Inc. v. United States,602 F.2d 959 (Ct. Cl. 1979). During its 1974 fiscal year, the average price per ton of coal that the Company sold was $ 16.26; in 1975, it was $ 37.96. This chaotic market, however, did entail more work for fewer sales. In 1974, the company sold 1,289,000 tons of coal; in 1975, with the Fooses working much longer hours, the Company sold only 1,220,000 tons. The Company paid Courtney and Mrs. Foos in equal amounts (except for one year) approximately 90 percent of its net profits as compensation. This appears to be disproportionately large based on the evidence of the prevailing commission rates for coal brokers who are purchasing agents and sales agents. Regarding petitioner's contention that the 90 percent figure was meant to include various other forms of compensation beyond straight commission, we observe that, although the securities industry may include stock appreciation opportunities, health and pension benefits and executive perquisites in its compensation package, no evidence has been adduced that *755 such programs are prevalent among coal brokers who trade as principals. Courtney testified that he sometimes paid agents a 10 cent ($ .10) per ton commission to find coal for him and paid other agents a 50 percent commission to sell coal for him. Courtney further testified he did approximately 80 percent of the Company's purchases and sales with Mrs. Foos doing the remaining 20 percent. We think, however, that Mrs. Foos and Courtney operated so closely as a team in planning their purchases and sales as well as actually effecting the trades that it is difficult to separate their respective services to the Company. We think the fact, that, except for one fiscal year when Courtney received an extra bonus, the Company pays Mrs. Foos and Courtney equally, demonstrates that it places equal value on the services Mrs. Foos performs, which emphasize financial and administrative work and include to a lesser extent trading and the services Courtney performs which emphasize trading and include to a lesser extent financial and administrative work. The policy of paying a percentage of the profits in brokering is based on sound business principles. It stimulates the trader to achieve the *756 optimal spread, consistent with the firm's business policies, between the price bid to buy and the price asked for sale, as well as to search out for as many acceptable trades as can be practicable handled. It encourages diligence and ambition of the employees and enables the corporation to compensate its employees without incurring the obligation beforehand. Where the earnings of a corporation do not depend upon the efforts of a large number of subordinates but are primarily due to the efforts of a few individuals, and the retention of these individuals in the employ of the corporation is necessary to its continued operation, the use of a percentage of net profits can be a valid factor determining reasonable compensation. J.D. Van Hooser & Co. v. Glenn, 50 F.Supp. 279, 285 (W.D. Ky. 1943). We think, however, that the 90 percent of net corporate profits formula used by the Company was too high given the prevailing rates paid to agent coal brokers and too insensitive to all the other factors which must be properly considered in determining reasonable compensation. See e.g., Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949). The *757 amounts we have determined to be reasonable compensation paid to the Fooses were still very large, but their efforts and their astute trading ability produced extraordinary profits for the Company. Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142 (1980). Section 162(a)(1) was not designed to regulate businesses by denying them a deduction for payment of compensation in excess of the norm. Home Interiors & Gifts, Inc. v. Commissioner,supra.
Because of all the factors and circumstances here present, we have given the issue herein close scrutiny with the result that we agree with neither petitioner nor respondent. On the basis of the entire record we hold that compensation set out in our ultimate findings of fact constitutes reasonable compensation for petitioners for the years in issue. Issue 2. Horse Operations
For each of the taxable years 1974, 1975 and 1976, expenses exceeded gross income in the horse racing and breeding business operated by Courtney as a sole proprietorship. Respondent has determined that $ 15,000 per year represents the proper allowance for personal services rendered by Courtney to this business. Courtney *758 argues that $ 1,500 per year is the reasonable value of Courtney service to the business. That respondent is arguing for a higher compensation level and Courtney for a lower figure results from the mechanics by which section 1348 limits the maximum tax rate to 50 percent of earned taxable income. Section 1348(b)(2) provides that earned taxable income of an individual is the excess of the amount which bears the same ratio (but not in excess of 100%) to the individual's taxable income as his earnednetincome bears to his adjusted gross income, over an amount calculated by reference his tax preference items as defined in section 57. Section 1.1348-2(d)(2), Income Tax Regs., provides in part, [T]he term "earned net income" means the excess of the total of earned income (as defined in § 1.1348-3(a)) over the total of any deductions which are required to be taken into account under section 62 in determining adjusted gross income and are properly allocable to or chargeable against earned income. Except as otherwise provided, deductions properly allocable to or chargeable against earned income include-- (ii) Deductions consisting of expenses paid or incurred in *759 connection with the performance of services as an employee * * * * Section 1.1348-3(a)(3)(i) Income Tax Regs., provides: (3) Earned income from business in which capital is material. (i) If an individual is engaged in a trade or business (other than in corporate form) in which both personal services and capital are material income-producing factors, a reasonable allowance as compensation for the personal services actually rendered by the individual shall be considered earned income, but the total amount which shall be treated as the earned income of the individual from such a trade or business shall in no case exceed 30 percent of his share of the net profits of such trade or business * * * * In Courtney's horse racing and breeding operations capital and personal services are material income producing factors. Section 1.1348-2(d)(4), example 7, Income Tax Regs., explains that where a proprietorship does not have net profits, its the expenses have not been taken into account in computing the net profits limitation. Accordingly, a ratable portion of deductible expenses of the proprietorship must be allocated to the earned income from the proprietorship in accordance with *760 section 1.1348-2(d)(2), Income tax Regs. [4] See also Rev. Rul. 78-64, 1978-1 C.B. 271. *761 For purposes of making the allocation required by section 1348(b)(2), respondent has determined that $ 15,000 is a reasonable allowance for the personal services rendered by Courtney in connection with his horse racing and breeding business. That determination is presumed to be correct and petitioner bears the burden of proving it otherwise. Botany Mills v. Commissioner,278 U.S. 282, 292 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner described himself as merely an "interested investor" whose sole contact with the horse business was reading the periodic financial statements and occasionally racing a horse. He did not offer any evidence as to the value of his services in this connection, other than his own testimony that a driver's customary 5 percent share of the purses won in the races in which he drove would have been approximately $ 1,500 each year. He did not testify as to what fee, other than a share of purses won, he would have had to pay another driver to drive in all the races in which he drove, and there is no evidence in the record which suggests that the only compensation paid to drivers is 5 percent of the purses in *762 races won. There is also no evidence as to the value of Courtney's services in training horses and in managing the business. Courtney reviewed the monthly financial statements, conferred with the trainers, hired the staff, and fired three trainers because he was not satisfied with their results. We think Courtney's involvement with the operations of his horse breeding and racing proprietorship was more than that of a mere interested investor. Accordingly, we sustain respondent's determination. To reflect our conclusions on the disputed issues, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue, unless otherwise indicated.↩
1. Unavailable↩
1. Company is a Subchapter S Corporation. ↩
2. Figure not available.↩
2. Subsequent amendments of the provision (changing "earned income" to "personal service income" and revising the definition), by section 302(a) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1554, and by sections 442(a) and 701(X)(1) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2878, 2920, do not affect the instant cases.↩
3. Since the Company is a corporation, whether capital is a "material income producing factor" is not directly an issue in this case under section 1348 as in effect during the years at issue. Section 1.1348-3(a)(3)(i), Income Tax Regs.↩
4. The following example demonstrates how lower allowance for a salary can be more beneficial to a taxpayer whose sole proprietorship incurs losses: Assume A had $ 100,000 of earned income (EI) from source X and operated a sole proprietorship where the gross income (GI) was $ 60,000 and the business expenses (BE) were $ 80,000. A's earned net income would vary as follows if the reasonable allowance for his services to the proprietorship were $ 10,000 and $ 1,000. $ 1,000 Proprietorship Earned Income (PEI) $ 1,000 (PEI) / $ 60,000 (GI) X $ 80,000 (BE) = $ 13,333 Deduction Allocable Against Earned Income $ 100,000 (EI) + 1,000 (PEI) / $ 101,000 Total Earned Income $ 101,000 - 1,333 / $ 99,667 Earned Net Income $ 10,000 Proprietorship Earned Income (PEI) $ 10,000 (PEI) / $ 60,000 (GI) X $ 80,000 (BE) = $ 13,333 Deduction Allocable Against Earned Income $ 100,000 (EI) + 10,000 (PEI) / $ 110,000 Total Earned Income $ 110,000 - 13,333 / $ 96,667 Earned Net Income Thus, if the reasonable allowance for A's services to his proprietorship were only $ 1,000, instead of $ 10,000, he would have a greater amount of his total income within the 50 percent maximum tax rate.↩